# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-03-00386-CV

**Cities of Alvin, Dickinson, Fort Stockton, Friendswood, La Marque, League City, Lewisville, and Texas City; Office of Public Utility Counsel; and State of Texas, Appellants**

**v.**

**Public Utility Commission of Texas; First Choice Power, Inc.; and Alliance for Retail Markets, Appellees**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. GN203764, HONORABLE JOHN K. DIETZ, JUDGE PRESIDING**

## O P I N I O N

This appeal concerns the Public Utility Commission's order increasing the fuel-factor component of the price-to-beat for First Choice Power, Inc. When appellants[1] sought judicial review of that order, the district court dismissed the case in part, concluding that many of appellants' challenges were untimely challenges to the validity of the rule governing fuel-factor adjustments. In the alternative, the court affirmed the order. We will affirm the district court's judgment.

---

[1] Appellants are the Cities of Alvin, Dickinson, Fort Stockton, Friendswood, La Marque, League City, Lewisville, and Texas City ("the cities"); the Office of Public Utility Counsel ("OPC"); and the State of Texas.

**BACKGROUND**

Texas is in transition from a regulated market for electricity toward a competitive market for the production and sale of electricity. *See State v. Public Util. Comm'n*, 131 S.W.3d 314, 318-20 (Tex. App.—Austin 2004, pet. filed) ("*2003 Rulemaking Case*"); *see also* Tex. Util. Code Ann. ch. 39 (West Supp. 2004); *see generally id*. §§ 11.001-64.158 (West 1998 & Supp. 2004) ("PURA"). As part of the transition, integrated utilities were required to "unbundle" into companies that respectively generate, transmit and distribute, and provide electricity; the unbundled companies may be wholly separate or remain affiliated. PURA § 39.051(b).

During the transition period, the Public Utility Commission ("the Commission") sets a price-to-beat for affiliated retail electric providers ("AREPs") that provide electricity to residential and small commercial customers. *See* PURA § 39.202(a). The price-to-beat is the base rate of the utility affiliated with the AREP (6% less than the utility's rate charged on January 1, 1999) as modified by the fuel factor, which adjusts the price-to-beat to account for changes in fuel prices. *Id*.

Previously, the fuel factor was set so that the utility could recover its estimated fuel cost; the resulting fees charged for fuel were later reconciled with the utility's actual fuel expenses. *See* PURA § 36.203; *see also Nucor Steel v. Public Util. Comm'n*, 26 S.W.3d 742, 745 (Tex. App.—Austin 2000, pet. denied). Companies could not automatically pass through their fuel costs (PURA § 36.201), and were required to show efficient generation, effective cost controls, and negotiation of the lowest reasonable fuel cost for its non-affiliated contracts. *Nucor*, 26 S.W.3d at 745 (citing 17 Tex. Reg. 7067 (1992), *amended* 18 Tex. Reg. 836 (1993)). For purchases from affiliated providers, the utility also had to show that the fuel expenses were reasonable and necessary

and that the affiliate did not charge the utility any more than it did other utilities in a similar class.

*Nucor*, 26 S.W.3d at 745.

During the transition period, the showing necessary to obtain an adjustment of the fuel factor is streamlined. An AREP may request that the Commission adjust the fuel factor up to twice per year by demonstrating that "the existing fuel factor does not adequately reflect significant changes in the market price of natural gas and purchased energy used to serve retail customers." PURA § 39.202(*l*). The Commission's rule implementing subsection (*l*) provides in relevant part as follows:

> An affiliated retail electric provider may request that the commission adjust the fuel factor(s) established under subsection (f)(3) of this section not more than twice in a calendar year if the affiliated retail electric provider demonstrates that the existing fuel factor(s) do not adequately reflect significant changes in the market price of natural gas and purchased energy used to serve retail customers. . . . The methodology for calculating the adjustment to the fuel factor(s) shall be the following:
>
> (A) For each business day of the ten-day period ending no more than ten business days before the filing of a fuel factor adjustment application, an average of the closing forward 12-month NYMEX Henry Hub natural gas prices, as reported in the Wall Street Journal, is calculated.
>
> (B) The average forward price for each business day calculated in subparagraph (A) of this paragraph will then be averaged to determine a ten-day rolling price.
>
> (C) The percentage difference between the averaged ten-day rolling price calculated under subparagraphs (A) and (B) of this paragraph and the averaged ten-day rolling price used to calculate the current fuel factor(s) is calculated. If the current fuel factor was calculated through an adjustment under subparagraph (E) of this paragraph, then the averaged ten-day rolling price calculated concurrent with that adjustment shall be used. If the percentage difference is 4.0% or more, the current fuel factor(s) may be adjusted.

(D)  To adjust the current fuel factor(s), the percentage difference is added to one and then multiplied by the current factor(s).  The results are the adjusted fuel factor(s) that will be implemented according to the procedural schedule in clause (i) and (ii) of this subparagraph:

   (i)  if no hearing is requested within 15 days after the petition has been filed, a final order shall be issued within 20 days after the petition is filed;

   (ii)  if a hearing is requested within 15 days after the petition is filed, a final order shall be issued within 45 days after the petition is filed.

26 Tex. Reg. 2680, 2707 (2001) ("Rule 25.41(g)(1)").[2]  When adopting rule 25.41, the Commission recognized "the undeniable fact that REPs [retail electric providers], affiliated or not, will not incur costs after 2002 based on a historic fuel mix; rather, all REPs will be purchasing power in the market."  26 Tex. Reg. at 2692.

This Court upheld rule 25.41 against a challenge that the Commission failed to establish a sufficient headroom—the difference between the price-to-beat and the sum of non-bypassable charges approved by the Commission.  *See Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 838 (Tex. App.—Austin 2001, no pet.).  Although no party in the original rulemaking process directly appealed the use of the NYMEX index[3] to assess and correct

_____

[2]  The rule was amended in part by 28 Tex. Reg. 3249 (2003).  The successive versions of the rule were codified at 16 Tex. Admin Code § 25.41.  For convenience, we will refer to the version adopted in 2001 as "rule 25.41" and the amended version adopted in 2003 as "amended rule 25.41."

[3]  The "NYMEX index" in this case is the New York Mercantile Exchange index of the closing forward 12-month natural gas prices at the Henry Hub.  It is published in the *Wall Street Journal*.  The Commission will compute an average of the prices each day (see rule 25.41(g)(1)(A)), then average those averages (see rule 25.41(g)(1)(B)).  *See State v. Public Util. Comm'n*, 131 S.W.3d 314, 319 n.3 (Tex. App.—Austin 2004, pet. filed) ("*2003 Rulemaking Case*").

inadequacies in the fuel factor, this Court later upheld *amended* rule 25.41 against challenges to the use of the NYMEX index, among other issues. *See 2003 Rulemaking Case*, 131 S.W.3d. at 322-25.

On May 9, 2002, First Choice applied to the Commission to increase its fuel factor under rule 25.41. The Commission found that First Choice's fuel factor was originally set based on a natural gas price of $3.111/MMBtu[4], and the relevant average natural gas price on the NYMEX index for ten business days from April 24, 2002 through May 7, 2002 was $3.817/MMBtu—an increase of 22.69%. The Commission found that it had previously concluded that the NYMEX gas index was representative of the price of natural gas and purchased energy, and that a 4% change in that price would satisfy minimally the requirement in utility code section 39.202 for "significant" change. The Commission determined that, because rule 25.41 was defined as the exclusive means of showing changes in the price of natural gas for this purpose, evidence of First Choice's actual costs and revenues was irrelevant; the only change First Choice had to show was the change in the NYMEX index. The Commission also concluded that the rate ceiling for the price-to-beat contained in PURA section 39.202(p) is not applicable to fuel factor adjustments under PURA section 39.202(*l*). Based on this demonstrated "significant" increase of greater than 4% in the price of natural gas and purchased energy used to serve retail customers, the Commission raised First Choice's fuel factor by 22.69%; the Commission found that First Choice's fuel factor would rise from 2.18¢/kWh[5] to 2.67¢/kWh, causing a typical residential customer using 1000 kWh per month to pay an additional $4.93 per month.

---

[4] MMbtu stands for one million British thermal units, a unit of measurement of gas.

[5] kWh stands for kilowatt hour, a measure of energy.

5

The Commission also concluded that a statutory provision requiring electric utilities to reimburse the cities' reasonable expenses for participating in a ratemaking proceeding does not apply in this case because First Choice is an AREP, not an electric utility. *See* PURA §§ 33.023 (requiring electric utilities to pay expenses), 31.002(6)(H) (excluding retail electric providers from definition of electric utility).

Appellants sought judicial review of the Commission's order. The district court found that most of appellants' challenges were actually directed to the validity of rule 25.41 and should have been brought in the original rulemaking challenge. Consequently, the court determined that the validity challenges brought in this ratemaking proceeding were untimely and that it had no jurisdiction over them; the court alternatively denied the challenges.[6] The court also denied the

---

[6] The challenges over which the district court concluded it lacked jurisdiction included challenges by all appellants. It included the following:

OPC's assertions that the Commission (1) exceeded its authority by increasing the fuel factor without requiring First Choice to demonstrate the statutorily mandated factors—*i.e.*, that the existing fuel factor does not adequately reflect significant changes in the market price of natural gas and purchased energy used to serve retail customers, (2) acted arbitrarily and abused its discretion by basing its decision on criteria irrelevant under PURA section 39.202(*l*) and rule 25.41(g)(1) and by failing to consider criteria relevant under these provisions, (3) acted arbitrarily and abused its discretion by raising the fuel factor without substantial evidence that the fuel factor did not adequately reflect significant changes in the market prices of natural gas and purchased energy used to serve retail customers as required by these provisions, (4) acted arbitrarily and abused its discretion by raising the fuel factor without making findings of fact on the market prices of natural gas and purchased energy used to serve retail customers, the significance of changes in the market prices, and the inadequacy of the fuel factor to reflect those changes, and (5) improperly excluded evidence of First Choice's costs and revenue, rendering its decision unsupported by substantial evidence and violative of PURA section 39.202(*l*) and rule 25.41(g)(1).

The State's assertions that the Commission eliminated the statutory requirement that First Choice demonstrate that the existing fuel factor does not adequately reflect significant changes in the market price and violated constitutional and statutory due-process requirements by imposing a

6

challenges timely and appropriately brought in this ratemaking proceeding, including contentions that the fuel-factor adjustment increased the price-to-beat to an impermissible level and that First Choice was required to reimburse the cities' expenses incurred in this proceeding.

## DISCUSSION

The State, OPC, and the cities raise several issues on appeal. Because many of these issues overlap, we will discuss them as if they were raised collectively. Appellants assert that the district court erred by concluding that it lacked jurisdiction to consider their challenges, excluding evidence of First Choice's actual costs and windfall profits, rendering a judgment not supported by substantial evidence or necessary findings of fact, setting the price-to-beat too high, finding no violation of due process in the 45-day time limit, and failing to require First Choice to reimburse the cities' costs.

## JURISDICTION

The district court concluded that it lacked jurisdiction over most of appellants' challenges to the Commission's order because they were untimely challenges to the validity of rule 25.41 that were filed in the wrong court. A validity challenge "tests a rule on procedural and

---

45-day time limit for processing fuel-factor adjustments.

The cities' assertions that the Commission failed to consider evidence of the price First Choice actually paid for natural gas and power used to serve retail customers and improperly authorized a windfall for First Choice, violating PURA section 39.202(*l*) and rule 25.41(g)(1) by failing to require First Choice to demonstrate that the existing fuel factor does not adequately reflect significant changes in the market price of natural gas and purchased energy used to serve retail customers.

7

constitutional grounds." *2003 Rulemaking Case*, 131 S.W.3d at 321 (citing *Eldercare Props., Inc. v. Texas Dep't of Human Servs.*, 63 S.W.3d 551, 558 (Tex. App.—Austin 2001, pet. denied)). The scope of a validity challenge also includes whether the agency had statutory authority to promulgate the rule. *Railroad Comm'n v. ARCO Oil and Gas Co.*, 876 S.W.2d 473, 477 (Tex. App.—Austin 1994, writ denied). PURA requires as follows: "A person who challenges the validity of a competition rule must file a notice of appeal with the court of appeals and serve the notice on the commission not later than the 15th day after the date on which the rule as adopted is published in the Texas Register." PURA § 39.001(f). Because appellants failed to file these challenges in this Court within 15 days after the adopted rule was published, the district court determined that it did not have jurisdiction over the validity challenges; the court alternatively decided the merits of appellants' challenges and denied them.

Appellants contend that the district court had jurisdiction because they challenge the application of the rule, not its validity. An applicability challenge does not question the general validity of a rule, but seeks a judicial declaration regarding the application of the rule in a particular fact situation. *Eldercare*, 63 S.W.3d at 558. Appellants describe the district court's decision as the application of a new and radical form of *res judicata*, and they caution that a company unaware that a rule affecting it was being adopted would find itself subject to the rule without recourse. Appellants assert that courts have jurisdiction to review Commission decisions, and that validity challenges generally may be pursued through declaratory-judgment actions. *See* PURA § 15.001; Tex. Gov't Code Ann. §§ 2001.038, .174 (West 2000) (part of the Administrative Procedures Act ["APA"]). Appellants argue that, because the rule uses the language of the statute, the basis for their

8

challenges was not apparent until the Commission misapplied it. They also contend that they challenge, not the language of the rule, but the Commission's failure to follow the rule by conflating the rule's provisions, excluding relevant evidence, and raising the fuel factor based on an inadequate record. They further contend that, between the adoption of the rule and its application, circumstances demonstrated that the Commission's theories supporting the rule were not borne out—*e.g.*, the NYMEX index proved not to accurately represent the market price of natural gas and purchased energy. They also warn that limiting challenges to the transition rules sets a precedent that will haunt future litigants in administrative proceedings and increase this Court's case load.

Appellants urge that we have discussed the scope of challenges permissible in district court in a case that, while distinguishable, should guide us to consider all of their challenges in this ratemaking proceeding. *See City Pub. Serv. Bd. of San Antonio v. Public Util. Comm'n*, 96 S.W.3d 355 (Tex. App.—Austin 2002, no pet.). In that case, we held that a challenge asserting that the Commission considered evidence outside the scope of the rule (from a previous proceeding declared void) was a challenge to the application of the rule, not to the validity of the rule's failure to mention the use of that evidence. *Id*. at 360. Here, we have the converse; appellants challenge the validity of the rule through challenges to the application of the rule. While appellants state some issues asserting that the rule was applied in unexpected ways, some challenges at their core address the validity of terms of the rule. We conclude that the latter should have been brought by direct appeal.

The district court's decision that it lacks jurisdiction over validity challenges is based, not on *res judicata*, but on statutory limits on the time and place for validity challenges. Unlike the general statutes permitting declaratory judgments regarding the validity of rules and substantial-

9

evidence reviews, challenges to the validity of a competition rule must be brought by direct appeal to this Court not more than 15 days after the date on which the rule as adopted is published in the Texas Register.  *Compare* Tex. Gov't Code Ann. §§ 2001.038, .174, *and* PURA § 15.001, *with* PURA § 39.001(f).  Appellants' argument that section 39.001(e) requires that appeals be conducted under the APA does not prevail because the  APA applies "unless otherwise provided"; the time and venue limitation of section 39.001(f) provides otherwise.  *See* PURA § 39.001.  This specific statute controls over the more general permission of validity challenges through declaratory-judgment actions.  *See Columbia Hosp. Corp. v. Moore*, 92 S.W.3d 470, 473 (Tex. 2002); *Lufkin v. City of Galveston*, 63 Tex. 437, 439 (1885).  Section 39.001(f) is unchallenged, mandatory, and exclusive.  Under the plain language of section 39.001(f), the district court had no jurisdiction over validity challenges, which must have been brought by direct appeal to this Court within 15 days after the adopted rule was published.  *See id*.  The statute does not provide that persons challenging the validity of a rule may wait until the rule is applied to them before challenging the validity of its terms under another provision.  *See id*.  While some persons may be bound before they are aware of the formulation of competition rules and the need to challenge them, we need not consider that issue because there is no indication in the record that we face that situation here.

Dismissal of validity challenges in this case should not create a torrent of validity challenges because of the specific limitation of the rule to competition rules.  *See* § 39.001(f).  The legislature determines the scope of our jurisdiction and that of district courts.  Tex. Const. art. V, §§ 6, 8; *see also* Tex. Gov't Code Ann. §§ 22.220, 24.007 (West 2004).  PURA requires that challenges to the validity of competition rules be brought directly and quickly in this Court.  *See*

10

PURA § 39.001(f). Although we may read the scope of challenges to validity narrowly, we cannot ignore statutory mandates in hopes of avoiding an onslaught of preemptive validity challenges.

Some of the challenges in this case are applicability challenges, some are validity challenges, and others straddle the line between the types. Rather than parsing the classifications at the outset, we will address the merits of challenges to the application of the rule, and dismiss those addressed to rulemaking that are not properly before us.

**SUBSTANTIVE CHALLENGES**

For the permissible challenges to the application of the statute and rule, we review the Commission's actions under the substantial-evidence standard, which provides as follows:

> If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:
>
> (1) may affirm the agency decision in whole or in part; and
>
> (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
>> (A) in violation of a constitutional or statutory provision;
>>
>> (B) in excess of the agency's statutory authority;
>>
>> (C) made through unlawful procedure;
>>
>> (D) affected by other error of law;
>>
>> (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

11

> (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Tex. Gov't Code Ann. § 2001.174.

When construing a statute, we must try to interpret the statute in a way that gives effect to the plain meaning of the statute's words and effectuates the legislature's intent. Tex. Gov't Code Ann. §§ 312.003, .005 (West 1998); *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). Statutory construction is a question of law that we review *de novo*. *Id.* We are not bound by an agency's interpretation of a statute that it administers or enforces. *Rylander v. Fisher Controls Int'l, Inc.*, 45 S.W.3d 291, 299 (Tex. App.—Austin 2001, no pet.). The supreme court summarized the process as follows:

> We look first to the "plain and common meaning of the statute's words." *Fitzgerald v. Advanced Spine Fixation Sys., Inc.*, 996 S.W.2d 864, 865 (Tex. 1999) (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 484 (Tex. 1998)). If a statute's meaning is unambiguous, we generally interpret the statute according to its plain meaning. *Fitzgerald*, 996 S.W.2d at 865. Moreover, we determine legislative intent from the entire act and not just from isolated portions. *Jones v. Fowler*, 969 S.W.2d 429, 432 (Tex. 1998). Thus, we "read the statute as a whole and interpret it to give effect to every part." *Jones*, 969 S.W.2d at 432.

*Gonzales*, 82 S.W.3d at 327. Regardless of whether the statute is ambiguous, we may consider, among other matters, the object sought to be attained, the circumstances under which the statute was enacted, the legislative history, the common law or former statutory provisions, including laws on the same or similar subjects, the consequences of a particular construction, the administrative construction of the statute, and the title (caption), preamble, and emergency provision. Tex. Gov't Code Ann. § 311.023 (West 1998).

12

Generally, we construe agency rules in the same manner as statutes, striving to give effect to the agency's intent and following the plain language of the rule unless it is ambiguous. *Rodriguez v. Service Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). But if there is vagueness, ambiguity, or room for policy determinations in the regulation, we will defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the rule. *H.G. Sledge, Inc. v. Prospective Inv. & Trading Co.*, 36 S.W.3d 597, 604 (Tex. App.—Austin 2000, pet. denied). The agency's interpretation of its rule represents the view of the regulatory body that drafted and administers the rule and essentially becomes a part of the rule itself. *Id.* Although the agency's interpretation of a statute is entitled to respect and weight, it does not bind us. *Fisher Controls*, 45 S.W.3d at 299.

**Proof of entitlement to increase fuel factor**

Appellants raise several challenges to the nature and sufficiency of the evidence considered by the Commission when increasing First Choice's fuel factor. They contend that the Commission violated its statutory authority by increasing the fuel factor (1) while not requiring First Choice to present necessary evidence, (2) allowing First Choice to present irrelevant evidence, and (3) barring appellants from presenting relevant evidence. Appellants contend that the evidence considered does not satisfy the statute or the rule.

Appellants argue that the Commission exceeded its authority and rendered portions of PURA section 39.202(*l*) and rule 25.41 meaningless by adjusting First Choice's fuel factor based only on a showing of a minimum 4% change in the NYMEX index. They correctly note that the statute does not refer to the NYMEX index and argue that the rule only uses the NYMEX index as

the mechanism by which the adjustment is calculated once the need for an adjustment is otherwise proved. They assert that there must be, in addition to proof of a 4% change in the NYMEX index, proof of the market price of gas and energy used to serve retail customers, proof of significant change in that price, and proof that the existing fuel factor does not adequately reflect that significant change. They complain that the record lacks evidence linking the NYMEX index, the price that First Choice paid for such gas and energy, and the market price of gas and energy actually used to serve retail customers. They contend that the Commission contravened PURA § 39.202(*l*) when it failed to determine whether the market prices of natural gas and purchased energy embedded in First Choice's purchased power contracts had significantly increased. Because the index is the only evidence First Choice offered to support an adjustment of its fuel factor, appellants contend that First Choice supplied no evidence to support the fuel-factor increase; accordingly, they assert that the Commission exceeded its authority by adjusting the fuel factor based solely on the increase in the NYMEX index.

*1. Use of the NYMEX index*

Resolution of many of appellants' issues turns on the extent of the use of the NYMEX index permitted by statute and rule. Neither the statute nor the rule specifies how a provider must, or must not, demonstrate change to the relevant market price or the fuel factor's inadequacy to reflect that change. *See* PURA § 39.202(*l*); rule 25.41(g)(1). The express language of rule 25.41 authorizes the NYMEX index as the means to calculate the remedy for inadequacies in the fuel factor and sets 4% as the minimum level of change in the NYMEX index to permit adjusting the fuel factor. *See* rule 25.41(g)(1)(A)-(D). But both the rule and the Commission's discussion of it indicate that the

14

NYMEX index will be used to assess the adequacy of the fuel factor to reflect significant changes in the market price of gas and purchased energy used to serve retail customers.

Appellants argue that the demonstration of the inadequacy of the fuel factor is a bifurcated process requiring separate determinations of the adequacy of the fuel factor and the adjustment of the fuel factor. They rely on the fact that the first sentence of the rule restates the statute's outline of the assessment process and only the subsections detailing the adjustment mechanism mention the NYMEX index. *See* rule 25.41(g)(1). Although it is possible to extrapolate from this structure the idea that the assessment and the adjustment are separate analyses, that extrapolation is not required and that idea is not consistent with the Commission's discussion contemporaneous with the adoption of the rule or with the rule's implementation. Appellants' bifurcation of the analysis would permit a finding of a significant change that fails to meet the 4% threshold, while a unitary process defines a 4% change as "significant" and adjusts the fuel factor upon a showing of that change. The less strained reading is that the comparison of the current NYMEX index with the index supporting the existing fuel factor, coupled with the 4% threshold, *is* the analysis for the significance of the change in the market price and of the adequacy of the fuel factor to reflect that change.

Whether the NYMEX index reflects the market price of natural gas and purchased energy used to serve retail customers concerns the validity of the rule. The Commission explained in the 2001 rulemaking proceeding that the NYMEX index is evidence of the market price of natural gas and purchased energy—regardless of the generation source of that electricity—used to serve retail customers. *See* 26 Tex. Reg. at 2692-94. The Commission noted "the undeniable fact that

15

REPs, affiliated or not, will not incur costs after 2002 based on a historic fuel mix; rather, all REPs will be purchasing power in the market." *Id*. at 2692. Purchases by REPs are, by definition, made to supply electric energy "to retail customers." *See* PURA § 31.002(17) (retail electric providers supply electric energy to retail customers). The Commission also stated, "Beyond 2002, the market price of generation will likely be set by gas-fired generation, and as such, it is appropriate to apply the changes in the market price of natural gas and purchased energy to the entire fuel factor in order to maintain the level of headroom in the price-to-beat." *Id*. at 2693. The Commission emphasized its intent to rely on market indices by providing for the use of an electricity commodity index after a sufficiently liquid one developed. *Id*. at 2693. Although commenters expressed concerns about the adequacy and reliability of the NYMEX index to represent the relevant market price (*see, e.g.*, 26 Tex. Reg. at 2682, 84, 91), the Commission rejected those concerns by adopting the NYMEX index as the sole measure of the market price. Thus, the Commission concluded that the NYMEX index represents the market price of natural gas and purchased energy used to serve retail customers.

The Commission also determined in the 2001 rulemaking proceeding that a change in the NYMEX index represents the requisite significant change in the market price. The Commission described the 4% change in the NYMEX index as the "materiality threshold" for changes in the index to show the statutorily required "significant changes" in market prices and therefore support adjustment of the fuel factor.[7] *See* 26 Tex. Reg. at 2694. The Commission thus

---

[7] The Commission wrote:

Based on the comments received, the commission concludes that a 4.0% materiality threshold is reasonable. The commission disagrees with those commenters suggesting that there be no materiality threshold. PURA §39.202(*l*)

16

linked the measurement of the adequacy of the fuel factor to reflect significant changes in market price and the mechanism to correct inadequacies, and concluded that the NYMEX index was sufficient for both tasks. The Commission has implemented the rule consistent with its discussion.

Although the amended rule is not before us, the Commission confirmed its adoption of the NYMEX index for these purposes in the 2003 rulemaking proceeding amending rule 25.41. *2003 Rulemaking Case*, 131 S.W.3d at 319. Because the Commission did not waver in its devotion to the NYMEX index, the arguments pertaining to the use of market price in that proceeding are instructive and persuasive regarding the Commission's interpretation of the enabling statute and the extent of the use of the NYMEX index under rule 25.41. *See id*. at 322-23. The 2003 amendments mainly concerned the threshold amount of change in the NYMEX index and the length of the period measured to evaluate the market price. *Id*. at 319; *see also* 28 Tex. Reg. 3249 (2003). The Commission concluded that the statute's reference to "market price" required use of a market index, and also concluded that the NYMEX index was sufficiently correlated to the market price of both

specifies that PTB fuel factors may be adjusted for '*significant* changes in the market price of natural gas and purchased energy . . . .' (emphasis added). Use of the term 'significant' indicates that some sort of threshold be demonstrated in order to justify an adjustment under § 39.202(*l*). . . .

The commission concludes that a 4.0% materiality threshold is reasonable because such a threshold is analagous [sic] to the existing materiality threshold in the current fuel rule. While the commission recognizes that the current 4.0% threshold is based on the current solid fuel and gas mix of the integrated utility, in a competitive market, the market clearing price of purchased power will be set by the marginal unit in the market, which will most likely be a combined-cycle gas turbine.

26 Tex. Reg. at 2694-95.

natural gas and of purchased energy used to serve retail customers. *See 2003 Rulemaking Case*, 131 S.W.3d at 323 (citing 28 Tex. Reg.at 3261-63); *see also* PURA § 39.202(*l*). The Commission rejected use of AREPs' actual costs, stating that "[b]asing price-to-beat fuel factor adjustments solely on the actual costs of the affiliated REP and not the market price of natural gas and purchased energy (as required by statute) will ignore the market prices that non-affiliated REPS must incur to compete against the affiliated REP." *2003 Rulemaking Case*, 131 S.W.3d at 323 (quoting 28 Tex. Reg. at 3261).

Appellants further complain that the Commission misapplied its own rule by making the adjustment automatic upon the finding of an index increase of more than 4%. The rule provides that, upon a showing that the index has changed by 4% or more, the Commission "may" adjust the fuel factor. Although the rule does not mandate a change on that showing, neither does it require an additional showing. If the index shows that the market price has changed and the fuel factor has not changed, it is logical under the Commission's reasoning to conclude that the fuel factor does not reflect the changed market price. Further, there is no finding or conclusion that the change is *automatic*, only that the Commission has determined that a 4% change in the NYMEX index satisfies the statutory requirement of a significant change. We decline to read the preamble of the rule and the statute to require showings additional to the 4% change in the NYMEX index average found sufficient by the Commission to satisfy both the statute and the rule.

The suitability of the NYMEX index to measure the relevant market price was decided in the rulemaking proceeding, and we cannot review it in this ratemaking proceeding. The Commission's determination in the rulemaking proceeding to use the NYMEX index as the sole

18

means to correct inadequacies in the fuel factor, combined with its linkage between the determination of adequacy and the correction of inadequacies, supports the Commission's use in this proceeding of the NYMEX index as the sole measure of the adequacy of the fuel factor.[8] The absence of any reference to the NYMEX index in the statute does not prohibit the Commission from using it for these purposes, and that use does not render the statute or the rule meaningless in whole or in part. Although the Commission could have chosen other methods either to assess the adequacy of the fuel factor or to adjust it—*i.e.*, looking to the AREP's actual costs, as appellants urge—we find no support for the argument that exclusive use of the NYMEX index to assess the adequacy of the fuel factor violates either the statute or the rule in a way subject to attack in this ratemaking proceeding. The Commission explained in the rulemaking proceeding why use of the AREP's actual costs was not only inappropriate but also contrary to the intent of the transitional statutes. The Commission's choice of the NYMEX index was unchallenged by direct appeal and reinforced in the 2003 amendment process. Therefore, this suit for judicial review of the ratemaking decision did not invoke the district court's jurisdiction to review the adoption of the NYMEX index-dependent method. The challenges to the application of the rule and statute in this regard likewise lack merit.

*2. Admissibility and sufficiency of evidence about adequacy of fuel factor*

Appellants complain about the type and sufficiency of the evidence admitted at the ratemaking hearing. Appellants decry the exclusion of their evidence regarding the prices actually

---

[8] We reached a similar conclusion based on additional testimony regarding the 2003 amendments to rule 25.41, which retained use of the NYMEX index but adjusted the materiality threshold and the measuring period. *See generally, 2003 Rulemaking Case*, 131 S.W.3d at 322-23.

paid by First Choice for natural gas or purchased energy used to serve retail customers. They assert that First Choice's evidence of NYMEX index rates is no evidence of the adequacy of the fuel factor to reflect significant changes in the market price of natural gas and purchased energy used to serve retail customers, and thus that First Choice failed to produce necessary evidence. They contend that evidence of the NYMEX index alone cannot satisfy various elements of the statute and rule. They contend that there was no evidence that First Choice would suffer losses if the Commission did not increase its fuel factor. They also contend that the increase of First Choice's fuel factor based on such limited evidence contravenes legislative intent for the price-to-beat.

Appellants argue that, by not requiring the AREPs to provide evidence of the *actual* prices paid for gas and energy "used to serve retail customers," the Commission has written words out of the statute. But the statute does not require "actual" prices paid, nor does it require the prices paid by an individual AREP; instead, it mandates that the "market" price is the standard to be used. The Commission decided within its authority that the relevant market price was the price that a new REP would have to pay to serve retail customers as reflected by the NYMEX index, not the price paid by First Choice or other AREPs.[9] As discussed above, the Commission determined in the rulemaking proceedings that the natural gas price drives the market price of purchased energy.[10] *See*

[9] In our opinion on amended rule 25.41, we discussed the Commission's theory that the use of current market prices, regardless of the price actually paid by affiliated retail electric providers under possibly lower long-term contracts, would further its goal of enabling and encouraging competitive electric providers to enter the market. *2003 Rulemaking Case*, 131 S.W.3d at 322-25.

[10] Appellants correctly point out that the district court inaccurately states in Conclusion of Law #7 that PURA section 39.202(*l*) looks "only to the market price of natural gas and purchased energy *as determined by the NYMEX Henry Hub index*." (Emphasis added.) The statute does not refer to the NYMEX index. However, because the conclusion of law is also accurately based on rule 25.41, the stray language in that conclusion regarding the statute did not harm appellants.

20

26 Tex. Reg. at 2694-95. Because that is the market in which REPs, companies that serve retail customers, purchase energy or gas, the NYMEX index is evidence of the price of gas and energy used to serve retail customers. Comparison of the current index to the index used to set the existing fuel factor is evidence of whether that market price has changed. Comparison of the rate of change to the 4% materiality threshold determines whether any change is statutorily significant. Under the rule as adopted in 2001, the NYMEX index is not irrelevant, is not just some evidence, but is conclusive evidence of the elements of the statute and the rule.

Accordingly, the Commission did not err by excluding evidence of prices actually paid for gas and energy, nor did it err by "ignoring" unrebutted evidence that the fuel-factor adjustment would lead to a windfall profit for First Choice. The Commission follows the rules of evidence applicable in civil cases. 16 Tex. Admin. Code § 22.221 (2004). "Irrelevant, immaterial, or unduly repetitious evidence shall be excluded." *Id*. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. Evidence regarding First Choice's purchase price and any windfall profits resulting from the fuel-factor adjustment does not bear on whether the NYMEX index has changed the requisite amount. The Commission did not err by excluding or refusing to consider such evidence.

Appellants' arguments that the Commission's actions contravene legislative history are not persuasive. Appellants contend that the legislature made the fuel factor adjustable in order to keep the price-to-beat from falling significantly below market so that competitors could enter the market, to provide a safe harbor for customers to receive service from their familiar suppliers at

21

regulated rates 6% lower than rates in effect before the transition began, and to protect providers from uncompensated losses.[11] The intent to develop a competitive market supports the Commission's action. The 6% price break was guaranteed only at the beginning of the period; the statute sets no upward limit on the price-to-beat due to fuel-factor adjustments. *See* PURA § 39.202(a), (*l*). The Commission determined that maintaining the price-to-beat at below-market levels would hinder the legislature's goal to have competitors enter the market. 26 Tex. Reg. at 2680, 92. While the Commission may have been concerned that setting too high a minimum change in the NYMEX index could inflict losses on AREPs, neither the statute nor the rule confines the fuel-factor's adjustability to loss prevention. Even if a price rise is not necessary to prevent losses, the Commission is within its discretion to determine that achievement of the legislature's express policy goal to foster competition (*see* PURA § 39.001(a)) outweighs other concerns. If, as appellants urge,

---

[11] Appellants cite both case law and legislative history. *See Reliant Energy, Inc. v. Public Util. Comm'n*, 62 S.W.3d 833, 838 (Tex. App.—Austin 2001, no pet.); *see also Public Utility Regulatory Act: Hearings on S.B. 7 Before the Senate Spec. Comm. on Elec. Util. Restructuring*, 76th Leg., R.S. at 18 (March 1, 1999). Appellants' arguments echo comments in the rulemaking proceeding before the Commission:

> OPC explained that the legislative policy for the price to beat is to provide a safe haven for residential and small commercial customers from any adverse impacts of competition that might arise during the transition period. The use of a fuel factor mechanism for adjustments, OPC explained, indicates that PTB customers would not face any consequences greater than under a regulated cost of service rate. OPC reasoned that the Legislature was aware that this provision placed risks on the affiliated REP, which no longer owned generation. OPC contended that the affiliated REP is required to absorb that risk unless it becomes so onerous that an adjustment to the PTB needs to be requested on financial integrity grounds.

26 Tex. Reg. at 2692.

the Commission misinterpreted legislative intent in promulgating the rule in 2001 and applying it in this case in 2002, the legislature had ample opportunity during its regular session in 2003 and four subsequent special sessions to clarify its intent. Although the legislature's silence is far from dispositive,[12] its silence on this issue is significant.

The Commission decided in the rulemaking proceeding that it would adjust an AREP's fuel-factor based on evidence of sufficient change in the NYMEX index over a specified period. The Commission indicated in the rulemaking proceeding, and confirmed in this adjustment proceeding, that the NYMEX index data alone would support the adjustment. There is no dispute that First Choice provided the NYMEX-derived data supporting a fuel-factor adjustment. The Commission did not err by excluding or failing to consider other evidence—even evidence of windfall profits that the Commission found "troubling." The Commission made findings and conclusions regarding what evidence was necessary under the rule and the statute to justify an increase in the fuel factor, and concluded that First Choice had supplied the necessary evidence. We conclude that sufficient evidence supports those findings and conclusions.

*3. Allowability of size of increase of price-to-beat*

Appellants argue that the fuel-factor increase violates a set limit on the price-to-beat. *See* PURA § 39.202(p). That section provides:

---

[12] "It is at best treacherous to find in congressional silence alone the adoption of a controlling rule of law." *Girouard v. United States*, 328 U.S. 61, 69 (1946), *quoted in Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 241 (1970).

On finding that a retail electric provider will be unable to maintain its financial integrity if it complies with Subsection (a), the commission shall set the retail electric provider's price-to-beat at the minimum level that will allow the retail electric provider to maintain its financial integrity. However, in no event shall the price-to-beat exceed the level of rates, on a bundled basis, charged by the affiliated electric utility on September 1, 1999, adjusted for fuel as provided by Subsection (b).

*Id*. Appellants argue that the phrase "in no event" means that the price-to-beat can never exceed the September 1, 1999 rate ("the 1999 rate") and that application of the statute is not limited to situations in which the provider's financial integrity is threatened. They assert without contradiction that the fuel-factor adjustment in this case causes First Choice's price-to-beat to exceed its 1999 rate.

The Commission argues that the adjustment in subsection (p) relates only to the initial setting of the price-to-beat. Subsection (p) refers to hardships imposed by compliance with subsection (a), which defines the price-to-beat and its period of applicability:

(a) From January 1, 2002, until January 1, 2007, an affiliated retail electric provider shall make available to residential and small commercial customers of its affiliated transmission and distribution utility rates that, on a bundled basis, are six percent less than the affiliated electric utility's corresponding average residential and small commercial rates, on a bundled basis, that were in effect on January 1, 1999, adjusted to reflect the fuel factor determined as provided by Subsection (b) and adjusted for any base rate reduction as stipulated to by an electric utility in a proceeding for which a final order had not been issued by January 1, 1999. These rates on a bundled basis shall be known as the "price-to-beat" for residential and small commercial customers, except that the "price-to-beat" for a utility is the rate in effect as a result of a settlement approved by the commission after January 1, 1999, if the commission determines that base rates for that utility have been reduced by more than 12 percent as a result of a final order issued by the commission after October 1, 1998.

(b) The commission shall determine the fuel factor for each electric utility as of December 31, 2001.

PURA § 39.202.

24

We conclude that subsection (p) does not prevent the price-to-beat from rising above the 1999 rates due to fuel-factor adjustments under subsection (*l*). Subsection (p) expressly applies only when the Commission finds that the provider will be unable to maintain its financial integrity if it complies with subsection (a). The "in no event" language applies to that situation alone; *i.e.*, regardless of the threat to financial integrity, the rate cannot exceed the 1999 price. The interaction of other provisions supports this constraint on the reach of subsection (p). Subsection (a) establishes the price-to-beat at a rate 6% below the rate charged on January 1, 1999, modified by the fuel factor determined under subsection (b). *See id.* § 39.202. Subsection (b) concerns only the initial setting of the fuel factor on December 31, 2001. The specificity of subsection (b) ties these interconnected subsections to the outset of the transition period. By contrast, the twice-yearly adjustments permitted under subsection (*l*) are not mentioned by subsection (p); we conclude that the adjustments under subsection (*l*) are not limited by subsection (p). Consumers get an initial price break of up to 6%, but adjustments due to increases in the market price of gas and energy can thereafter drive the price-to-beat higher.

Even if subsection (p) applied through the entire transition period, its express terms limit its application to adjustments to the price-to-beat based on preservation of financial integrity as described in the first sentence of subsection (p). Reading it to limit adjustments based on market price under subsection (*l*) would cap the price-to-beat for several years regardless of energy prices, rendering the fuel-factor adjustment provisions of subsection (*l*) essentially nugatory in an inflationary energy market and preventing providers from recovering their fuel costs. The Commission's interpretation implements the legislature's balance between protecting consumers and fostering competition.

25

As the State's policy changes from regulation to competition in the provision of electricity, so too must the measures taken to protect the customers. The legislature has placed its faith in market forces to ultimately provide price control. The Commission's implementation of its rules, while a departure from historical procedure, is within the bounds of legislative directives and the Commission's rules.

**45-day time limit**

Appellants complain that the 45-day timeline for the fuel-factor adjustment process is far too short. They contend that it prevents them from mustering evidence and having a meaningful hearing. They argue that the timeline is unprecedented for a contested case and is driven by the Commission's desire to have an uncontested process.

This is primarily a challenge to the rule that would have been appropriate in the rulemaking proceeding. When these arguments were raised regarding the amended rule, this Court was not persuaded and concluded that the Commission had acted within its authority in adopting the 45-day timeline. *2003 Rulemaking Case*, 131 S.W.3d at 325-26. This Court held that the 45-day timeline satisfied the Administrative Procedures Act, that the relatively short period helped provide market certainty and responsiveness to market shifts, and that the process of evaluating changes in the NYMEX index was so straightforward that it did not require extensive preparation or lengthy hearings. *Id*. at 326. This Court declined to rule out the possibility that a particular entity might be able to show a deprivation of due process in a particular case.

Appellants do not show that the application of this rule has deprived them of due process. They argue that they were prevented from developing and presenting evidence, but their

26

complaints concern evidence of First Choice's actual costs and other factors beyond the NYMEX index, all of which the Commission deemed irrelevant. They do not argue that the time limit prevented them from mustering evidence pertaining directly to changes in the NYMEX index itself. Because we have found no error in the exclusion of evidence not pertaining to the change in the NYMEX index, we find no deprivation of due process if the 45-day time period prevented development of any such evidence deemed irrelevant under the statutory and regulatory scheme.

**Failure to require reimbursement of cities' rate-case expenses**

Appellants complain that the Commission violated statutory authority and agency precedent by failing to require First Choice to reimburse the cities for reasonable expenses incurred in this proceeding. The relevant statute provides:

> (a) The governing body of a municipality participating in or conducting a ratemaking proceeding may engage rate consultants, accountants, auditors, attorneys, and engineers to:
>
> > (1) conduct investigations, present evidence, and advise and represent the governing body; and
> >
> > (2) assist the governing body with litigation in an electric utility ratemaking proceeding before the governing body, a regulatory authority, or a court.
>
> (b) The electric utility in the ratemaking proceeding shall reimburse the governing body of the municipality for the reasonable cost of the services of a person engaged under Subsection (a) to the extent the applicable regulatory authority determines is reasonable.

PURA § 33.023. Appellants argued, and the ALJ found, that this is a ratemaking case and, for purposes of ratemaking reimbursement, the Commission can require an AREP to "assume the role

27

of an electric utility." The ALJ opined that requiring reimbursement of the cities' expenses promotes the goal of encouraging municipalities to participate in ratemaking proceedings.

The Commission acknowledged the policy concerns favoring reimbursement, but concluded that the statutory exclusion of "retail electric provider" from the definition of "electric utility" bars application of the responsibilities of an electric utility on First Choice, which is an affiliated retail electric provider. *See* PURA § 31.002(6)(H) ("'Electric utility' . . . does not include . . . a retail electric provider . . . ."). Although the statute separately defines AREPs (*id*. § 31.002(2)) and retail electric providers (*id*. § 31.002(17)), it defines AREPs as a subset of retail electric providers. *Id*. § 31.002(2) ("'Affiliated retail electric provider' means a retail electric provider that is affiliated with or the successor in interest of an electric utility certificated to serve an area.").

Appellants contend that the reimbursement requirement applies to AREPs. They contend that the fuel-factor adjustments are ratemaking proceedings and that AREPs are electric utilities for the purpose of these proceedings. They assert without contradiction that the fuel-factor adjustment is within the definition of a ratemaking proceeding. *See Southwestern Pub. Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 218-19 (Tex. App.—Austin 1998, pet. denied) (because fuel cost reconciliation proceedings change rates, they are ratemaking proceedings and therefore require reimbursement of municipalities' costs). However, First Choice and the Commission oppose the arguments that AREPs are utilities.

Appellants cite statutes defining utilities as well as more general provisions to support their argument that AREPs are utilities for reimbursement purposes. They contend that the definitions in section 31.002 exclude only retail electric providers—not AREPs—from the definition of electric utility, and distinguish AREPs from retail electric providers. *See id*. § 31.002(2), 6(H),

28

(17). They contend that this distinction is real because AREPs remain under some regulation, while retail electric providers are not regulated. Appellants contend that the larger context of PURA supports treating the AREPs as utilities for this purpose. They cite the distinction between the AREPs' "rates" (indicating regulation) and the "prices" to be determined by competition (indicating nonregulation) as showing that AREPs are more like regulated utilities than unregulated providers. *Compare id*. § 39.202, *with id*. § 39.001. They argue that the placement of the burden of proof in contested cases on the "incumbent electric utility" by PURA section 39.003 means that AREPs must be utilities because otherwise AREPs would not have the burden of proof in the fuel-factor adjustment cases like this one.

We disagree. The plainest reading of the definitions is that, because AREPs are a subset of retail electric providers which expressly are not electric utilities, AREPs are not electric utilities. While AREPs may be regulated more than unaffiliated retail electric providers, appellants' argument that the general placement of the burden of proof on utilities requires that AREPs be treated as utilities is unpersuasive because the fuel-factor adjustment statute itself specifically places the burden of proof on AREPs. *See id*. § 39.202(*l*).

We conclude that First Choice is an AREP, not a utility, and that neither statutory law, case law, nor agency precedent requires First Choice to reimburse the cities' costs on these facts.

## CONCLUSION

Appellants brought many challenges to the Commission's adjustment of First Choice's fuel factor. The district court correctly concluded that it had no jurisdiction over challenges

29

to the validity of the rule because appellants did not comply with the time and venue requirements for such challenges. The district court correctly concluded that the remainder of the challenges were without merit, finding that the Commission acted within its authority by raising the fuel factor and by not ordering First Choice to reimburse the cities for their expenses. Because the Commission did not abuse its discretion, exceed its authority, act arbitrarily, or otherwise err in any way shown harmful to appellants, we affirm the district court's judgment.

_____

Mack Kidd, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed

Filed:   August 26, 2004