ACCEPTED
15-25-00018-CV
FIFTEENTH COURT OF APPEALS
AUSTIN, TEXAS
7/14/2025 2:17 PM
CHRISTOPHER A. PRINE
CLERK

NO. 15-25-00018-CV

IN THE COURT OF APPEALS
FOR THE FIFTEENTH JUDICIAL DISTRICT
AT AUSTIN, TEXAS

FILED IN
15th COURT OF APPEALS
AUSTIN, TEXAS
7/14/2025 2:17:01 PM
CHRISTOPHER A. PRINE, Clerk

**PUBLIC UTILITY COMMISSION OF TEXAS,**

*Appellant / Cross-Appellee,*

v.

**CITY OF DENTON, OPERATING AS
DENTON MUNICIPAL ELECTRIC,**

*Appellee / Cross-Appellant.*

On Appeal from the 459th Judicial Court,
Travis County, Texas
Cause No. D-1-GN-23-008974

## BRIEF FOR APPELLEE

JOSE E. DE LA FUENTE
State Bar No. 00793605
GABRIELLE C. SMITH
State Bar No. 24093172
JAMIE L. MAULDIN
State Bar No. 24065694
ROSLYN M. WARNER
State Bar No. 24117520
**LLOYD GOSSELINK
  ROCHELLE &TOWNSEND, P.C.**
816 Congress Ave., Suite 1900
Austin, Texas 78701
(512) 322-5800
(512) 472-0532 (fax)

**ATTORNEYS FOR APPELLEE**

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................2

TABLE OF AUTHORITIES................................................................4

GLOSSARY OF TERMS ................................................................6

SUMMARY OF THE ARGUMENT ........................................................8

ARGUMENT & AUTHORITIES ............................................................13

    A.    The Commission failed to comply with state law and its own regulations by applying the improperly amended RFP to DME's Application. ................. 13

        1.    The Commission failed to properly notice the significant change to the RFP per its own rules or statute. ........................................... 14

        2.    The Commission did not provide notice of a potential change to the RFP in its Open Meeting Agenda, which is a violation of Texas law................................................... 17

        3.    The Commission's argument regarding the preservation of error is misplaced. ............................ 18

            a.    Requirement for Motion or Rehearing. ............. 19

            b.    The requirement for a motion for rehearing to identify errors with "particularity" means putting the agency on notice. ............................................... 20

            c.    DME preserved the issue of improper adoption of the amended RFP for appeal in its Motion for Rehearing. .................... 21

        4.    Applying the amended RFP to DME's Application infringed upon DME's vested rights. ................................................... 25

    B.    Setting a DSCR for DME of only 1.25X is not supported by substantial evidence. .................................... 29

        1.    No party rebutted the presumption that a 0.25x DSCR adder is reasonable for DME. ................. 29

2.    The Commission misapplied the governing rule in setting DME's DSCR. .......................................32

3.    The record supports a minimum DSCR of 1.50x. ..........................................................36

4.    The Commission ordered an insufficient DSCR based on extra-legal factors. ............................39

CONCLUSION AND PRAYER .............................................................43

CERTIFICATE OF COMPLIANCE .......................................................44

INDEX OF APPENDICES .....................................................................45

# TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Bluefield Water Works & Imp. Co. v.
Pub. Serv. Comm'n of the State of W. Va.,*
262 U.S. 679 (1923) ...................................................................... 8, 26

*City of Alvin v. Pub. Util. Comm'n of Tex.,*
143 S.W.3d 872 (Tex. App.—Austin 2004, no pet.) ........................... 35

*Fed. Power Comm'n v. Hope Nat. Gas Co.,*
320 U.S. 591 (1944) ...................................................................... 8, 26

*In re K.N.P.,*
179 S.W.3d 717 (Tex. App.—Fort Worth 2005, pet. denied) .............. 25

*Landgraf v. USI Film Prods.,*
511 U.S. 244 (1994) ............................................................................ 28

*Owens Corning v. Carter,*
997 S.W.2d 560 (Tex. 1999) ............................................................... 28

*Rodriguez v. Serv. Lloyds Ins. Co.,*
997 S.W.2d 248 (Tex. 1999) ......................................................... 34, 35

*State v. Pub. Util. Comm'n of Tex.,*
883 S.W.2d 190 (Tex. 1994) ........................................................... 8, 26

*Subaru of Am., Inc. v. David McDavid Nissan, Inc.,*
84 S.W.3d 212 (Tex.2002) .................................................................. 25

*Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.,*
652 S.W.2d 358 (Tex.1983) ...................................................... 8, 20, 26

*Temple Indep. Sch. Dist. v. English,*
896 S.W.2d 167 (Tex. 1995) ............................................................... 29

*Tex. Alcoholic Bev. Comm'n v. Gutierrez,*
2012 Tex. App. LEXIS 6487
(Tex. App.—San Antonio Aug. 8, 2012, no pet.) ................................ 21

**<u>Statutes</u>**

Tex. Gov't Code § 551.042 ........................................................................ 17

Tex. Gov't Code § 2001.144 ...................................................................... 19

Tex. Gov't Code § 2001.146 ...................................................................... 20

Tex. Gov't Code § 2001.171 ...................................................................... 19

Tex. Gov't Code § 2001.174 ...................................................................... 13

**<u>Rules and Regulations</u>**

Tex. R. Evid. 201 ...................................................................................... 18

16 Tex. Admin. Code § 22.80............................................................. 14, 16

16 Tex. Admin. Code § 25.192..................................................... 14, 32, 33

# GLOSSARY OF TERMS

| | |
|---|---|
| ALJs | Administrative Law Judges Linda Brite and Daniel Wiseman |
| Amended Application | Amended Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service, PUC Docket No. 52715, December 1, 2022 |
| Application | Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service, PUC Docket No. 52715, November 1, 2021 |
| AR | Administrative Record |
| City | City of Denton |
| Commission | Public Utility Commission of Texas |
| DME | Denton Municipal Electric |
| DSCR | Debt Service Coverage Ratio |
| ERCOT | Electric Reliability Council of Texas |
| Final Judgment | Judgment of District Court in Cause No. D-1-GN-23-008974 on January 16, 2025, on judicial review of PUC Docket No. 52715. |
| Final Order | Order in PUC Docket No. 52715, October 12, 2023 |
| GFT | General Fund Transfer |
| IOU | Investor-Owned Utility |

| | |
|---|---|
| MOU | Municipally Owned Utility |
| OPUC | Office of Public Utility Counsel |
| PFD | Proposal for Decision |
| PURA | Public Utility Regulatory Act, codified as Texas Utilities Code Section 11.01, *et seq.* |
| RFP | Rate Filing Package |
| SOAH | State Office of Administrative Hearings |
| TCOS | Transmission Cost of Service |
| TIEC | Texas Industrial Energy Consumers |
| TSP | Transmission Service Provider |

## SUMMARY OF THE ARGUMENT

The District Court correctly found that the Commission erred in its Final Order by limiting DME's debt service coverage ratio, or DSCR, to 1.25x and that the error prejudiced DME's substantial rights. The Final Order limiting DME's DSCR deprived DME of the opportunity to recover a reasonable return and was based on the consideration of impermissible factors as well as an illegally modified RFP, points that were directly raised in DME's Motion for Rehearing and appeal to the District Court. This Court should affirm the District Court's reversal of the Commission's decision as to DSCR.

The Commission's Final Order violated an essential tenet of ratemaking—a regulated utility must be allowed a reasonable opportunity to recover its operating expenses together with a reasonable return on its investment. *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 196–97 (Tex. 1994). "This requirement is met only if the return is sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital." *Id.*, (citing *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 362 (Tex.1983)); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *Bluefield Water*

*Works & Imp. Co. v. Pub. Serv. Comm'n of the State of W. Va.*, 262 U.S. 679, 692–93 (1923). As the Commission has consistently stated yet failed to apply in this case, a MOU like DME needs sufficient return dollars over and above its actual operating expenses to meet its cash needs. (Appellant's Br. at 4.) The Commission permits multiple methods for calculating an MOU's return—cash flow, debt service coverage ratio, times interest earned ratio, and rate of return. (RR at Ex. 1, AR 118 at 15:15–19.) DME uses the debt service coverage method. (RR at Ex. 1, AR 176 at 49:10.)

Debt service coverage is a measure of annual revenues in excess of operations and maintenance costs that are available to meet principal and interest payment obligations on outstanding debt. (RR at Ex. 1, AR 176 at 49:21–23.) To compute the return under this method, the value used in the determination is expressed as a ratio. Establishing a sufficient DSCR ensures DME will be able to cover its debts, signals creditworthiness on the market to potential lenders, and, as one would expect, impacts the cost of capital that DME will ultimately incur. (RR at Ex. 1, AR 183 at 7:7–22.)

In its Final Order on DME's transmission cost of service application filed in 2021, the Commission set DME's DSCR at 1.25x. This decision was arbitrary and capricious by virtue of both the Commission's extra-legal

intent to punish DME for "overearning" and by applying a Rate Filing Package ("RFP") that the Commission modified without any public notice in violation of both state law and Commission rule. (CR 60–61.) If the Commission had applied the correct RFP, accurately applied its own rules, and appropriately evaluated the administrative record considering only legally permissible factors, it necessarily would have ordered a DSCR of at least 1.50x. Instead, the Commission (by its own admission) never strayed from its extra-legal plan to penalize DME based on a non-existent definition of "overearning." Rather than letting the evidence and facts lead to the only supportable conclusion, the Commission worked backward: choosing its desired conclusion in advance, then manufacturing a case to support that pre-determined conclusion, going so far as to rigidly apply a RFP that the Commission "amended" in plain violation of TOMA.

When confronted with the inescapable fact that the Commission improperly based its DSCR decision on an RFP that was illegally "amended" at a meeting where such possible action was not noticed on the posted agenda as required by TOMA, the Commission retreats to a disingenuous argument that DME failed to preserve the issue by raising it in its Motion for Rehearing. That argument evaporates under the bright light of the plain

10

statements of error in DME's Motion for Rehearing complaining about exactly that, including:

- *"no formal notification for the change to the RFP"* (RR at Ex. 1, AR 162 at 13);

- *"amending a rule . . . without proper procedure or notice to affected parties"* (RR at Ex. 1, AR 162 at 13); and

- *"ad hoc rulemaking at the Open Meeting on October 6, 2022"* (RR at Ex. 1, AR 162 at 15.)

DME's Motion for Rehearing provided the Commission with plainly stated notice of its complaint about the Commission's "amendment" of the RFP without proper public notice and without following the requisite procedures, at the exact open meeting at issue. Indeed, if these statements did *not* put the Commission on notice of DME's objection to the Commission taking action to change its rules outside the law, one wonders what they *did* provide the Commission notice of. The Commission has always been aware of that legal defect. It just did not—and still does not—have any answer or excuse for its disregard of state law.

Finally, applying the improperly amended RFP to DME resulted in the Commission reducing DME's DSCR by at least 0.25x, causing material harm to DME by reducing its rate of return. DME was entitled to the presumption of a 0.25x adder to its DSCR as provided by the legally effective

11

RFP. That presumption was not rebutted by any party in the administrative proceeding and thus should have been applied. Additionally, in considering DME's DSCR, the Commission disregarded its own administrative rule, failing to consider DME's most recent rate-setting action in setting its DSCR policy in spite of the rule requiring consideration of that action. These layers of improper decisions and failures to follow the law and the Commission's own rules each led to the Commission setting an improperly low DSCR for DME.

A decision based on an illegally enacted policy or rule, including decisions that disregard the law and valid rules, is irrevocably tainted. A decision based on extra-legal factors is likewise irrevocably tainted by that impropriety. Reversal of that decision is the only proper path. The District Court got it right when it reversed the Commission's improper decision as to DME's DSCR, and this Court should affirm.

## ARGUMENT & AUTHORITIES

**A.  The Commission failed to comply with state law and its own regulations by applying the improperly amended RFP to DME's Application.**

The Commission asks this Court to uphold its error in the Final Order that improperly limited DME's DSCR to 1.25x.  As justification, the Commission cites to the RFP modified as of November 2022, and to spurious and extra-legal allusions to "reasonableness" to correct perceived "overearning."  None of those factors or rationale support upholding and continuing the Commission's plain error.

As an initial matter, the Commission's reliance on the modified RFP in setting DME's DSCR at 1.25x is not just misplaced but constitutes reversible error because the RFP was not properly modified under the law.

Under substantial evidence review, a court "shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are . . . made through unlawful procedure." Tex. Gov't Code § 2001.174(2)(C) (emphasis added).  That is exactly what happened here; the Commission based its decision as to DME's DSCR on an unlawful procedure—specifically, on a RFP that was modified in violation of Texas law.

13

### 1. *The Commission failed to properly notice the significant change to the RFP per its own rules or statute.*

The Commission's regulations require publishing notice in the Texas Register for any significant change to the RFP so that potentially affected entities can do their due diligence. 16 Tex. Admin. Code § 22.80. That makes sense, as the RFP is the set of forms and guiding procedures a utility is required to use in filing a rate case. 16 Tex. Admin. Code § 25.192(c)(5). Utilities like DME rely on the content of these forms to ensure they provide all requisite information to the Commission in a TCOS application. There are different RFPs for IOUs and non-IOUs (MOUs like DME). The non-IOU TCOS RFP was adopted at the Commission's December 16, 1999 Open Meeting. (RR at Ex. 1, AR 206 at 1.) The non-IOU TCOS RFP has remained relatively unchanged since its implementation and was in effect when DME filed the Application in 2021.

The RFP instructions include definitions and schedule requirements for different models and calculations. Schedule C-2 is the schedule for the debt service coverage method for a non-IOU. At the time DME filed the initial Application in Docket No. 52715, the RFP instructions for Schedule C-2 read as follows:

> Schedule C-2: Debt Service Coverage (DSC) Method:
>
> A return based on the TSP's debt service expenses as of the end of the Historic Year, and the debt service coverage levels stated in the TSP's most recently issued bond and debt covenants plus additional coverage of 0.25 for municipal utilities and river authorities shall be presumed reasonable. To the extent the utility can show that short-term debt has been utilized in a cost-effective manner as a reasonable alternative to long-term financing, its principal and interest and an additional coverage of 0.25 may be included in calculating the return. The return for short-

(RR at Ex. 1, AR 183 at 20.)

On October 6, 2022, almost a full calendar year *after* DME originally filed its Application, the Commission took a vote to modify its non-investor-owned utility transmission cost of service RFP at an Open Meeting while considering another contested case, purportedly eliminating a presumption that 0.25x additional coverage is reasonable for MOUs in Schedule C-2. (RR at Ex. 1, AR 146 at 27.)

The Commission then incorporated that change into a new version of the RFP, which appeared on the Commission's website on November 9, 2022. (RR at Ex. 1, AR 206; AR 183 at 22.)

> Schedule C-2: Debt Service Coverage (DSC) Method:
>
> A requested return may be based on the TSP's debt service expense as of the end of the Historic Year and the debt service coverage levels stated in the TSP's most recently issued bond and debt covenants. To the extent the utility can show that short-term debt has been utilized in a cost-effective manner as a reasonable alternative to long-term financing, its principal and interest and an additional coverage of 0.25 may be requested in calculating the return. The return for short-term debt shall not include the coverage that is specified in the bond and debt covenants unless the covenants include short-term debt service in the denominator of the DSC ratio that is used to calculate default on the debt. To the extent there are no minimum debt service coverage

(RR at Ex. 1, AR 206 at 15.)

But there was a problem with that entire course of action: the Commission did all of that without providing *any* notice of the fact that it would be considering and possibly amending the RFP.

This unnoticed change to the non-IOU RFP violated the Commission's own regulations.

> … prior to the implementation of any new form or *significant change* to an existing form, the change or new form shall be referenced in the "In Addition" section of the Texas Register for public comment. For good cause, new forms or *significant changes* to existing forms may be implemented without publication on an interim basis for a period not to exceed 180 days.

16 Tex. Admin. Code § 22.80 (emphasis added).

The Commission argues that there was no need to publish notice of the Commissioners' discussion and vote to change the non-IOU TCOS RFP because it was not a significant change. (Appellant's Br. at 30.) That argument does not ring true when the "amended" RFP removed a 0.25x DSCR adder presumption from the existing RFP. Of course that was a significant change.

16

### 2. *The Commission did not provide notice of a potential change to the RFP in its Open Meeting Agenda, which is a violation of Texas law.*

The Commission argues in its Brief that it took action and "properly modified" the RFP during its Open Meeting on October 6, 2022. (Appellant's Br. at 28.) The Commission asks this Court to uphold its application of the changed RFP standards despite failure to provide *any* notice of such potential changes before they were made as required not just by its own Rules, but also by the Open Meetings laws of this State. What the Commission did with respect to that unnoticed subject went well beyond what the Commission was legally allowed to do. The Texas Open Meetings Act states in relevant part:

> (a) If, at a meeting of a governmental body, a member of the public or of the governmental body inquires about a subject for which notice has not been given as required by this subchapter, the notice provisions of this subchapter do not apply to:
>
> > (1) a statement of specific factual information given in response to the inquiry; or
> >
> > (2) a recitation of existing policy in response to the inquiry.
>
> **(b) Any deliberation of or decision about the subject of the inquiry shall be limited to a proposal to place the subject on the agenda for a subsequent meeting.**

Tex. Gov't Code § 551.042 (emphasis added).

The Commission did not place the unnoticed subject of amending the RFP on any future agenda as required by TOMA; it went full-steam ahead and amended the RFP. Review of the official video broadcast of the October 6, 2022 Open Meeting shows that the entire process, from inception of the plan to final vote, happened in less than five minutes during the meeting.[1] The Commission was required to provide advance public notice of this subject (if it intended to take any action on it), but it did not do so. The relevant agenda item states only "Docket No. 52353 – Application of Rayburn Country Electric Cooperative, Inc. to Change Wholesale Transmission Service Rates. (Final Order)"—it says *nothing* about the non-IOU RFP, and there would be no reason anyone would anticipate a change to the non-IOU RFP to take place under that agenda item.

### 3. The Commission's argument regarding the preservation of error is misplaced.

In its Brief, the Commission objects to DME's complaint about the Commission's plain violation of the Texas Open Meetings Act in its briefing and argument before the District Court. Specifically, the Commission

---

[1] The Court can take judicial notice of the Commission's public record of the meeting pursuant to Texas Rule of Evidence 201. The relevant video broadcast of October 6, 2022 Open Meeting can be found at https://www.adminmonitor.com/tx/puct/open_meeting/20221006/, and the pertinent discussion is during Item No. 18, at 50:02–54:36.

argues that the District Court improperly considered the Commission's Open Meeting violation because the specific Texas Open Meetings Act statute was not cited in DME's Motion for Rehearing, even though the Motion for Rehearing repeatedly complained of the Commission's improper consideration of the modified non-IOU RFP based on the Commission's improper amendment of same without providing the requisite notice. (RR at Ex. 1 , AR 162, at 9–15.) The Commission contends that consideration of the Texas Open Meetings Act is thus barred as a basis for challenge to the Final Order.

The Commission is wrong; DME's Motion for Rehearing consistently complained about the Commission's action in amending the RFP without providing notice or following required procedures, putting the Commission on notice that its improper and illegal action was a matter for rehearing and thus appeal.

### a. *Requirement for Motion or Rehearing.*

A motion for rehearing is a condition precedent to judicial review action. Tex. Gov't Code §§ 2001.144, 2001.171.

A motion for rehearing must "identify with particularity findings of fact or conclusions of law that are the subject of the complaint and any

19

evidentiary or legal ruling claimed to be erroneous. The motion must also state the legal and factual basis for the claimed error." Tex. Gov't Code § 2001.146(g).

It's undisputed that DME filed a reasoned motion for rehearing identifying specific points of error, including several directly referencing the improper "amendment" of the RFP.

### b. The requirement for a motion for rehearing to identify errors with "particularity" means putting the agency on notice.

The Administrative Procedure Act does not state criteria for particularity or specificity required of the "legal and factual basis for the claimed error" in a motion for rehearing—instead, we turn to the courts. And the courts tell us only that motions for rehearing must be sufficiently definite to apprise the agency of the error claimed and to allow the agency opportunity to prepare to defend it. *Suburban Util. Corp. v. Pub. Util. Comm'n of Tex.*, 652 S.W.2d 358, 365 (Tex. 1983).

Further, courts have consistently stated that a party challenging final agency action simply needs to give the agency enough heads-up to understand what the error is and why a finding or conclusion doesn't meet the standard (e.g., isn't supported by substantial evidence). *See id.* (court

said that the motion was sufficiently specific as it "allege[d] the adjusted value of $342,010 was not supported by substantial evidence, thereby specifically apprising the Commission that the order fails to meet the test for review of this administrative proceeding."); *see also Tex. Alcoholic Bev. Comm'n v. Gutierrez*, 2012 Tex. App. LEXIS 6487, at *7–8 (Tex. App.—San Antonio Aug. 8, 2012, no pet.) ("The general purpose of a motion for rehearing is simply to put the agency on notice for errors for which the aggrieved party seeks judicial review" and "full briefing is not required; rather, it is sufficient to preserve error if the motion apprises the TABC of the claimed error allowing the agency to defend it.").

### c. DME preserved the issue of improper adoption of the amended RFP for appeal in its Motion for Rehearing.

The issue of the Commission improperly modifying the RFP was not newly raised in the District Court—the Commission was put on unambiguous notice by DME's Motion for Rehearing that it failed to give proper public notice of such potential modification as a governmental and regulatory body and that the modified rate package should not have been retroactively applied mid-docket. The point of error in the Motion for Rehearing reads as follows:

1. "The Commission improperly modified its Rate Filing Package and erroneously applied the modified Rate Filing Package to DME's application."

2. "The Order errs in finding that the modification to the RFP does not affect DME's vested rights."

3. "The Commission's own rules and record support DME's requested DSC ratio."

(RR at Ex. 1, AR 162 at 9, 12, 16.)

Further, and specifically, in support of point one, DME's Motion for Rehearing cited to the comments made by Commissioners, without due notice, during the October 6, 2022 Open Meeting at which the RFP was illegally modified without first being placed on the agenda for potential action. (*See* RR at Ex. 1, AR 162 at 11.) DME called out the Commission's improper reliance on the Commissioners' attempts during that meeting to "clean up the rate filing package." (RR at Ex. 1, AR 162 at10.)

The act that rendered the amended RFP unlawful under TOMA was the Commission's act of amending it without the requisite notice. That complaint about lack of notice, right down to citing the very meeting at

which the RFP was illegally modified, was made plain in multiple places in DME's Motion for Rehearing:

- "[T]he Commission *issued no formal notification for the change to the RFP.*"

- "*Informally amending a rule through a contested case hearing without proper procedure or notice to affected parties*, especially parties with pending applications, is unjust and discriminatory."

- "There were no circumstances to make the Commission's *ad hoc rulemaking at the Open Meeting on October 6, 2022*, appropriate and valid."

(RR at Ex. 1, AR 162 at 15 (emphasis added).)

The dispute and the point of error here is not a matter of agenda language that failed to satisfy the Open Meetings Act's requirement of sufficiently specific notice—there was *no* language about the subject matter to be addressed (the RFP) at all, and thus *no* notice—the very defect raised by DME multiple times and ways in its Motion for Rehearing. The Commission's Agenda for the October 6, 2022 meeting was silent on the subject of the RFP and the possibility of amending same. The Texas Register was silent, as well. There was no notice given *at all*—as is required by law—and the Commission cannot credibly argue that DME's Motion for Rehearing did not put the Commission on notice of that defect  It is undisputed that the Commissioner's October 6, 2022 comments and act of

23

"amending" the RFP were not forecasted by notice in the Texas Register or a Commission agenda item for the meeting, thus the Commission was not authorized to take action to modify the RFP at the Open Meeting where it did just that. That's the point of error, and the Commission's failure to provide the requisite notice and follow the requisite procedures for taking such action is directly stated as a subject of complaint in DME's Motion for Rehearing.

Having been put on notice of DME's complaint, the Commission acknowledges that no notice was given,[2] but argues that it didn't have to give notice because the change was not "significant" (which, even if such characterization were true, would only absolve the Commission of its violation of its own rules, *not* of its violation of TOMA). Thus, the point of error that the Commission's failure to provide notice of amending the RFP rendered any decision based on that improperly amended RFP erroneous was properly preserved in DME's Motion for Rehearing, which complained

---

[2] The Commission does make a passing attempt to argue that it gave notice under the Act because the Commission's October 6, 2022 Agenda gave notice that the Commission would be acting on an application of another entity. (Appellant's Br. at 43–45.). But of course, that topic as stated makes no mention of any consideration of amending non-IOU RFP so as to put any person on notice that amendment of the RFP might take place at that meeting.

of a lack of notice that was contrary to *all* applicable statutory and regulatory authority.

### 4. *Applying the amended RFP to DME's Application infringed upon DME's vested rights.*

Additionally, even if it had been adopted in compliance with the law at the October 6, 2022 Open Meeting, the amended non-IOU RFP should not have been applied in PUC Docket No. 52715 because such application was retroactive.

It is well-settled that laws may not operate retroactively to deprive or impair vested substantive rights acquired under existing laws, or create new obligations, impose new duties, or adopt new disabilities in respect to transactions or considerations past. *In re K.N.P.*, 179 S.W.3d 717, 720 (Tex. App.—Fort Worth 2005, pet. denied). It is also established that "no litigant has a vested right in a statute or rule that is remedial or procedural in nature and that affects no vested substantive right." *Id.*, (citing *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 219 (Tex.2002)).

The Commission contends that the change resulting from the modified RFP removing the adder did not affect any substantive vested right, but rather that the Commission's process for evaluating a utility's rate of return—which is what amending the RFP in fact does—is only procedural

25

in nature and therefore does not affect a utility's vested substantive right. (Appellant's Br. at 38–39.)

That position is nonsensical; the relevant change here isn't amending a timeline for filing or requiring submission of an application on a newly numbered form.  Rather, it limits potential return and recovery for a non-IOU by removing the presumptive 0.25x adder.  That is, it has a real and direct impact on the actual amount of revenue recovery by a non-IOU transmission provider.

A regulated utility must be allowed a reasonable opportunity to recover its operating expenses together with a reasonable return on its invested capital.  *State v. Pub. Util. Comm'n of Tex.*, 883 S.W.2d 190, 196–97 (Tex. 1994).  "This requirement is met only if the return is sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and attract capital."  *Id.*, (citing *Suburban Util. Corp.*, 652 S.W.2d at 362); *Fed. Power Comm'n v. Hope Nat. Gas Co.*, 320 U.S. 591, 603 (1944); *Bluefield Water Works & Imp. Co. v. Pub. Serv. Comm'n of the State of W. Va.*, 262 U.S. 679, 692–93 (1923).  The Commission's argument that removal of the adder does not impact a vested, substantive right in its rate of return calculation—when that change directly impacts a non-IOU's

ability to recover a reasonable return on its invested capital—clashes with the basic tenets of utility ratemaking and common sense. DME is measurably and significantly financially harmed by this modification. Its credit ratings and the ability to obtain loans at reasonable rates will certainly be impacted. The record evidence shows that DME's current bonds are rated "A" by Fitch Ratings and "A+" by Standard & Poor's (S&P) Ratings Services. (RR at Ex. 1, AR 176, 50:20–24.) The ALJs' PFD and the Commission's Final Order fail to address or contemplate this impact, however, nor do they cite any analysis on the impact of the DSCR to DME's credit rating before excluding the adder and adopting a significantly lower DSCR coverage than is contemplated by the only legally effective RFP.

The RFP in effect at the time DME originally filed the Application is consistent with the City's Policy. DME used that RFP to calculate its proposed rates and rate of return based on inclusion of a 0.25x adder for MOUs. DME had no knowledge (nor could it) that the Commission would modify the section of the RFP that applies specifically to its rate of return methodology during the pendency of this case, without notice and without following the Commission's own rules and state law, and then apply it retroactively to DME's Application. "The prohibition against retroactive

27

laws derives largely from the sentiment that such laws unfairly deprive people of legitimate expectations." *Owens Corning v. Carter*, 997 S.W.2d 560, 572 (Tex. 1999) (citing *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265, (1994)). The Final Order violates that longstanding principle of law. Furthermore, the PFD's analysis that DME should have amended its application using the modified RFP on December 1, 2022 ignores record evidence that the modified RFP did not even appear online until November 9, 2022 (again, with no notice, so no party had any reason to even *look for* such online posting). (RR at Ex. 1, AR 183 at 22, Attachment AP-4, AR 183 at 23, Attachment AP-5.)

Informally amending a rule through unnoticed discussion at an open meeting in direct contravention of proper procedure and state law, especially without notice to parties with pending applications that would be directly affected by such amendment by materially reducing their rate of return, has no legal support and, by its very nature interferes with and deprives such parties of their rights.

Accordingly, the District Court's decision must be affirmed on this point.

**B. Setting a DSCR for DME of only 1.25X is not supported by substantial evidence.**

### 1. *No party rebutted the presumption that a 0.25x DSCR adder is reasonable for DME.*

Because the most recent "amended" RFP is defective and inapplicable based on the errors discussed above and confirmed by the District Court's ruling on the issue, the prior RFP (in effect at the time DME filed the initial November 2021 Application) is the controlling RFP. Accordingly, in setting DME's DSCR, the Commission should have applied that RFP's presumption that a 0.25x adder is reasonable. Failing to do so constitutes reversible error.

The applicable RFP includes a presumption that a 0.25x DSCR adder is reasonable for MOUs. (RR at Ex. 1, AR 117 at 20.) If a presumed fact is not rebutted by contradictory evidence, the trier of fact is required to reach a particular conclusion. *Temple Indep. Sch. Dist. v. English*, 896 S.W.2d 167, 169 (Tex. 1995). The presumed fact under the applicable RFP is that if the utility is an MOU, then a 0.25x adder is reasonable. No party controverted this presumed fact. The Commission argues that only if a utility requested the DSCR under its bond covenants, *then* would the 0.25x be presumed reasonable. (Appellant's Br. at 38–39.) This is a

categorical misstatement of the presumed fact as stated in the RFP and adds meaning to the RFP language that is simply not there.

The Commission itself makes only the conclusory statement that Commission Staff, OPUC, and TIEC "challenged the reasonableness of Denton's requested rate of return" and "provided evidence that Denton's requested DSCR was unreasonable." (Appellant's Br. at 9, 20.) But challenging the reasonableness of DME's requested DSCR is not synonymous with rebutting the presumption as to the specific 0.25x adder. No party introduced any evidence of why a 0.25x adder is unreasonable for DME. Instead, their presentation of evidence focused only on why DME's *overall* requested rate of return was not reasonable. But the presumed fact from the RFP is not that DME's overall requested return was reasonable. In fact, if anything, Commission Staff's evidence *supported* the presumed fact from the RFP, as their alternative DSCR recommendation was 1.50x—the 1.25x minimum in DME's bond covenants plus the 0.25x adder presumed reasonable for MOUs per the RFP. (RR at Ex. 1, AR 112 at 21:21–22:6.) Moreover, as discussed in greater detail below, the other parties fixated on factors like DME's historical earnings (to then implicate their legally unrecognized theory of

past "overearning") that were not relevant to rebutting the presumption under the RFP.

The Commission's additional misguided contention is that DME had to specifically request a 1.50x DSCR for the presumption to apply. (Appellant's Br. at 22.) The Commission makes a nonsensical argument that "[w]hat Denton asked for was over and above the presumption" and "for *that reason alone*, the presumption did not apply." (Appellant's Br. at 23 (emphasis added).) The very function of a presumption is that it *automatically* applies unless and until it is successfully rebutted. Under the plain language of the RFP in place when DME filed the Application, a 0.25x DSCR adder was . . . something that is *added* to the requested DSCR and presumed reasonable for municipal utilities. The only thing DME needed to establish for the adder to be presumed reasonable is that it is an MOU. Even so, the Commission argues that "Denton provided no support for the additional 0.25x." (Appellant's Br. at 22.) Commission Staff's witness also asserted that any coverage above 1.00x is a hurdle requiring a robust evidentiary showing. (RR at Ex. 1, AR 112 at 18:5–12.) But this argument is in stark conflict with the presumption stated in the controlling RFP. No party introduced evidence to rebut the

31

presumption and, as a result, the Commission was required to apply the presumption.

### 2. The Commission misapplied the governing rule in setting DME's DSCR.

In the Application, DME requested a 1.75x DSCR. The record shows that DME's bond covenants require a minimum DSCR of 1.25x and that Denton adopted City Debt Management Policy No. 403.07 ("City Policy") requiring DME to maintain a 1.50x DSCR on all outstanding revenue bonds and other indebtedness of the utility system. (RR at Ex. 1, AR 176 at 171:15–19; AR 178 at 3:4–4:8.)[3] The record also shows that a 1.75x DSCR with a 10.19% rate of return, as requested in DME's Amended Application, is well within the range of other non-IOU TCOS applications approved by the Commission. (RR at Ex. 1, AR 176 at 172.)

The Commission misstates its rule related to DSCR by claiming that the rule directs the Commission to consider either the most recently issued bonds *or* a DSCR provided by a city ordinance. (Appellant's Br. at 25.) This is not the approach required by the rule. Title 16 of the Texas

---

[3] At the time DME filed the original Application, the City was in the process of updating its policy to require a DSCR of 1.50x for all existing and future debt issuances. The new policy was passed on November 16, 2021, and was incorporated into DME's supplemental testimony filed in December 2021. (RR at Ex. 1, AR 178 at 3:4–5:2.)

Administrative Code Section 25.192(c)(3) instead requires that *both* bond indentures or ordinances *and* the most recent rate setting action of the TSP must be considered:

> For municipally owned utilities…the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the commission will consider the coverage ratios required in the TSP's bond indentures or ordinances **and** the most recent rate action of the rate setting authority for the TSP.

16 Tex. Admin. Code § 25.192(c)(3) (emphasis added).

Conclusion of Law No. 9 in the Final Order similarly states, "In determining a reasonable coverage ratio, the Commission will consider the coverage ratios required in Denton's bond indentures or ordinances **and** the most recent rate action of the rate setting authority for Denton under 16 TAC § 25.192(c)(3)." (RR at Ex. 1, AR 159 at 10.) (emphasis added). In contrast, the Commission's decision to impose a 1.25x DSCR disregards the requirements of its own rule, instead focusing solely on the RFP language (which it contends is not binding law) (Appellant's Br. at 16.)

In conflict with the applicable rule, the RFP imposes a stepped analysis. The RFP in place when DME filed the Application stated:

33

[a] return based on the TSP's debt service expenses as of the end of the Historic Year, and the debt service coverage levels stated in the TSP's most recently issued bond and debt covenants plus additional coverage of 0.25 for municipal utilities…shall be presumed reasonable…. To the extent there are no minimum debt service coverage requirements in the TSP's bond resolutions, the Board of Director's policy, with respect to coverage, shall be considered."

(RR at Ex. 1, AR 183 at 20, Att. AP-3 at 5.)

The Commission relies entirely on this stepped analysis by arguing that the Commission will *only* look at a city policy if the most recently issued bonds do not state a DSCR. (Appellant's Br. at 21.) The modified RFP contains similar language requiring the Commission to consider only the city's policies if the bond or debt covenants do not contain minimum debt service requirements. (RR at Ex. 1, AR 206 at 15.) In testimony, Commission Staff referred to the RFP as the "primary factor" motivating its 1.25x DSCR recommendation and argued that it leaves no ambiguity. (RR at Ex. 1, AR 112 at 14:22–15:3.) The testimony does not address the unambiguous requirement under the applicable rule that the Commission consider both the bond indentures *and* DME's most recent rate action.

The Texas Supreme Court construes administrative rules in the same manner as statutes because they have the same force as statutes. *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). Unless the rule is

34

ambiguous, the Court follows the rule's clear language with the objective of giving effect to the agency's intent. *Id.* If there is vagueness, ambiguity, or room for policy determinations in a regulation, the court will defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the rule. *City of Alvin v. Pub. Util. Comm'n of Tex.*, 143 S.W.3d 872, 881 (Tex. App.—Austin 2004, no pet.). Thus, where the RFP is inconsistent with the plain language of the authorizing rule, the Court must defer to the rule.

In this instance, the language of the rule is unambiguous—the Commission is required to consider **both** the bond and debt covenants **and** the most recent rate action by the TSP's rate authority. The Commission even incorporated this language into its Order, but then inexplicably failed to follow it in setting DME's DSCR. As established and even argued by the Commission itself, the RFP is not law so as to trump Commission rules. As such, the Commission's rule controls the DSCR inquiry here. The RFP inappropriately modifies (and thus is inconsistent with) the Commission's rule by limiting the consideration of city policies to certain circumstances. The Commission's decision in this case hinges on an analysis and limitation of relevant factors that is

inconsistent with the governing law. Therefore, when read together, the City Policy requiring a 1.50x DSCR on all outstanding bond covenants and the Commission's requirement under its rule to consider Denton's ordinance **and** the most recent rate action when setting a rate of return, combined with the 0.25x DSCR adder in the controlling RFP, support a 1.75x DSCR.

### 3. *The record supports a minimum DSCR of 1.50x.*

Apart from the clear conflict between the presumption in the RFP and the applicable rule, there is additionally no mathematical support in the record for ordering a DSCR of only 1.25x. OPUC's witness identified a 1.42x DSCR as reasonable, although he admitted that he was "backing into" what he thought was a reasonable rate of return. (RR at Ex. 1, AR 168 at 72:19–74:20.) While OPUC's proposal was based on letting conclusions drive facts rather than the other way around, this is nonetheless support that a DSCR above 1.25x is warranted in this case. Further, Commission Staff's recommended alternative recommendation was 1.50x DSCR—an acknowledgment that application of the adder under the correct RFP results in a 1.50x DSCR.

36

The Commission's briefing characterizes Denton's bond covenants as requiring an exact 1.25x DSCR. (Appellant's Br. at 16, 20, 25.) That is incorrect, and contrary to record evidence; the City's bond requirements specify a DSCR of 1.25x *or greater*. (RR at Ex. 1, AR 3 at 242 (labeled 65).) The requirement that a regulated utility must be provided the opportunity to earn a reasonable rate of return is met only if the return is sufficient to assure confidence in the financial integrity of the enterprise in order to maintain its credit and attract capital. The Commission itself states that an MOU needs sufficient return dollars over and above its actual operating expenses to meet its cash needs. (Appellant's Br. at 4.) If the City's own debt covenants require a 1.25x *or greater* DSCR, and the City policy requires a 1.50x DSCR, limiting DME's DSCR to its floor with no presumed adder creates the likelihood of significant financial harm if Denton cannot meet its debt obligations. One criterion bond rating agencies use in determining the credit quality of public power debt issuers is the DSCR, and artificially lowering the DSCR reduces DME's rate of return significantly. (RR at Ex. 1, AR 176 at 50:20–51:6.) The Commission performed no analysis of the financial

37

impacts of the 1.25x DSCR, despite all record evidence supporting a higher DSCR.

The Commission seems to argue that a minimum DSCR listed in a bond covenant is conclusive evidence for using that same DSCR for calculating return. But other recent Commission decisions undercut this flawed premise. Shortly after the conclusion of Denton's case, the Commission acknowledged the importance of ensuring a utility's sufficient financial standing and compliance with debt covenants and found that a utility may need a DSCR greater than the minimum in their debt covenants to do so. *Application of the City of Lubbock, Acting by and Through Lubbock Power & Light (LP&L) to Change Rates for Wholesale Transmission Service*, PUC Docket No. 54657, Order at 2–3 (Oct. 24, 2024). Here, DME demonstrated that a DSCR greater than the minimum in its bond covenants is necessary to avoid the financial risk of violating its bond covenants.

The Commission argues that even under the prior (and still legally valid) RFP the Commission would have reached the same conclusion. (Appellant's Br. at 16.) But this is incorrect. Even if the PUC disagrees with DME's reliance on applying the presumption to the City Policy

38

DSCR, the presumption unequivocally applies to the 1.25x in Denton's bond covenants. Accordingly, under the prior RFP, the *minimum* DSCR supported by the record is 1.50x DSCR. This is true even by the Commission's logic (*see* Appellant's Br. at 22). Regardless of whether DME's requested DSCR was 1.50x DSCR, application of the presumption to the record evidence supports a minimum 1.50x DSCR.

### 4. The Commission ordered an insufficient DSCR based on extra-legal factors.

All of the above-described errors are premised on the Commission's admitted consideration of extra-legal factors, which formed the foundation for every element of its decision to minimize DME's recovery and rate of return in its TCOS rate. A decision indisputably so driven by impermissible factors cannot be sustained.

Maintaining steadfast consistency, Commission Staff stated repeatedly that suspected "overearning" by DME is a foundational motivating factor for setting a 1.25x DSCR. (RR at Ex. 1, AR 131 at 23, wherein Commission Staff specifically identified "DME's current significant overearning and history of significant overearning on its transmission function" in its list of factors to be considered.) Similarly, intervenor TIEC provided as a justification for overcoming the RFP

presumption DME's "windfall returns for many years" and "history of earning an outsized return." (RR at Ex. 1, AR 132 at 2.) The Commission continues to push these spurious claims in its briefing before this Court, arguing that by requesting a reduction from its previously approved revenue requirement, DME has "tacitly admitted that it was overearning." (Appellant's Br. at 7.)

Of course, such definitions of "overearning" cannot be found anywhere in the law. The Commission plainly and proudly based its decision on a legally non-existent and thus impermissible factor. Once the bell of "we based our decision on something we are not allowed to consider" has been rung, it cannot be unrung.

To "overearn" means to earn beyond the utility's latest Commission-authorized rate of return. Thus, the limit when considering whether DME has ever "overearned" is based entirely on the limit ordered by the Commission itself following DME's last comprehensive TCOS proceeding (PUC Docket No. 30358). It is undisputed that DME has never earned anything beyond the return set by an order of the Commission. The Commission's action to limit DME's DSCR is an effort to correct supposed past "overearning" that is based on some other

40

arbitrary definition. There are no objective criteria tied to this decision, either to limiting DME's rate based on overearning or the determination of overearning itself. Rather, the Commission has favored prioritizing correction of perceived "overearning" and consistently disregarded the one undisputed and objective factor throughout this case: the fact that DME never earned revenues in excess of its Commission ordered rate of return.

The Commission's reliance on extra-legal factors does not end there; the Commission additionally argues that "the Commission's ability to set lower rates was delayed by Denton's failure to provide a required depreciation study." (Appellant's Br. at 7.) That argument ignores the lack of authority for requiring a depreciation study and clear rulings from the Administrative Law Judge that DME was not required to provide the study. (RR at Ex. 1, AR 29 at 3.) Each of these points raised at *every phase* of the processing of DME's application and appeal thereof, illustrate that the Commission's decision to limit DME's DSCR to 1.25x is inextricably tied to irrelevant and inappropriate factors, resulting in a decision that is not properly based on the actual evidence. The District Court's decision is further confirmation of the arbitrary and capricious

41

nature with which the Commission evaluated DME's application and ultimately set a DSCR unsupported by the record, and thus cannot be supported under the law.

## CONCLUSION AND PRAYER

Appellee therefore respectfully asks the Court to affirm the Final Judgment of the District Court reversing and remanding the provision of the Public Utility Commission's Final Order limiting DME's debt service coverage ratio to 1.25x. Appellee further respectfully requests any and all other relief to which Appellee may be justly entitled.

Respectfully submitted,

**LLOYD GOSSELINK**
  **ROCHELLE & TOWNSEND, P.C.**
816 Congress Avenue, Suite 1900
Austin, Texas 78701
(512) 322-5800 Phone
(512) 472-0532 Facsimile

By:   */s/ Jose E. de la Fuente*
         JOSE E. de la FUENTE
         State Bar No. 00793605
         jdelafuente@lglawfirm.com
         GABRIELLE C. SMITH
         State Bar No. 24093172
         gsmith@lglawfirm.com
         JAMIE L. MAULDIN
         State Bar No. 24065694
         jmauldin@lglawfirm.com
         ROSLYN M. WARNER
         State Bar No. 24117520
         rwarner@lglawfirm.com

**ATTORNEYS FOR APPELLEE**

43

## CERTIFICATE OF COMPLIANCE

I, Jose E. de la Fuente, attorney for Appellee/Cross-Appellant, certify that this document was generated by a computer using Microsoft Word 365, which indicates that the word count of this document is 7,246 per Tex. R. App. P. 9.4(i).

*/s/ Jose E. de la Fuente*
JOSE E. DE LA FUENTE

# INDEX OF APPENDICES

**App. A**    Final Judgment and Order, signed January 16, 2025 (CR 60–61)

**App. B**    Attachment AP-3 to the Rebuttal Testimony of Antonio Puente, Jr.: Excerpt from Public Utility Commission of Texas Transmission Cost of Service Rate Filing Package for Non-Investor Owned Transmission Service Providers in the Electric Reliability Council of Texas (Adopted in December 16, 1999) (RR at Ex. 1, AR 183 at 16–21)

**App. C**    Tex. Gov't Code § 551.042

**App. D**    Tex. Gov't Code § 2001.144

**App. E**    Tex. Gov't Code § 2001.146

**App. F**    Tex. Gov't Code § 2001.171

**App. G**    Tex. Gov't Code § 2001.174

**App. H**    16 Tex. Admin. Code § 22.80

**App. I**    16 Tex. Admin. Code § 25.192

# APPENDIX A

**CAUSE NO. D-1-GN-23-008974**

| | | |
|---|---|---|
| CITY OF DENTON | § | IN THE DISTRICT COURT |
| OPERATING AS DENTON | § | |
| MUNICIPAL ELECTRIC | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| PUBLIC UTILITY COMMISSION OF | § | |
| TEXAS, | § | |
| *Defendant.* | § | |
| | § | 459th JUDICIAL DISTRICT |

## FINAL JUDGMENT AND ORDER

On November 13, 2024, the hearing on the merits was held in the judicial review of the Public Utility Commission's (the "Commission") Final Order (the "Final Order") in *Application of Denton Municipal Electric to Change Rates for Wholesale Transmission Service,* PUC Docket No. 52715. All parties appeared through counsel, and the administrative record was admitted into evidence.

The Court reviewed the Final Order in this appeal pursuant to Texas Utilities Code § 15.001 and Texas Government Code § 2001.174. Based on the pleadings, administrative record, briefs submitted, and argument of counsel, it is the opinion of the Court that the Commission's Final Order erred by limiting DME's debt service coverage ratio to 1.25x and this error prejudiced the substantial rights of plaintiff/appellant DME.

The Court specifically finds that the Final Order prejudiced the substantial rights of plaintiff/appellant DME and should be reversed as follows:

The Commission's decision to set DME's debt service coverage ratio at 1.25x, including and as stated/incorporated in Findings of Fact provisions 50–58A, Conclusions of Law provisions 9–11A, and Ordering Paragraphs 1-5 of the Final Order, was arbitrary and capricious and was improperly based on a Rate Filing Package that was modified in violation of state law (the Texas Open Meetings Act) and Commission Rule, thus constituting a violation of both a statutory provision and required procedure, and is hereby reversed.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that the Commission's Final Order provision limiting DME's debt service coverage ratio to 1.25x is reversed and remanded to the Commission for further proceedings consistent with this Order.

The Court denies all other relief not granted in this Final Judgment. This Final Judgment disposes of all parties and all claims and is appealable. All costs of court in this cause are adjudged against Defendant.

Signed on January 14, 2025

Hon. Maya Guerra Gamble
Presiding Judge

I, VELVA L. PRICE, District Clerk, Travis County, Texas, do hereby certify that this is a true and correct copy as same appears of record in my office. Witness my hand and seal of office

On _____

03/03/2025 09:18:51
VELVA L. PRICE
DISTRICT CLERK
By Deputy: VNB

# APPENDIX B

PUBLIC UTILITY COMMISSION OF TEXAS

Project No. 21276

*Modification of Rate Filing Package for Transmission Rates*

TRANSMISSION COST OF SERVICE

RATE FILING PACKAGE
FOR
NON-INVESTOR OWNED TRANMISSION SERVICE PROVIDERS
IN THE ELECTRIC RELIABILITY COUNCIL OF TEXAS

(Non-IOU TCOS-RFP)
Pursuant to §25.192

As Adopted in December 16, 1999 Open Meeting

1

# TABLE OF CONTENTS

*GENERAL INSTRUCTIONS*............................................................................................................*5*

*DEFINITION OF TERMS AND ACRONYMS*..........................................................................*10*

*SECTION I : HISTORIC YEAR DATA*.....................................................................................*11*
    Schedule A: Summary of Total Cost of Service by Function (See Attached Form) ...........................11

**SCHEDULE B: RATE BASE**........................................................................................................**12**
    Schedule B: Summary of Rate Base by Function (See Attached Form) .............................................12
    Schedule B-1: Original Cost of Plant.................................................................................................12
    Schedule B-2: General Plant Functionalization ...............................................................................12
    Schedule B-3: Communication Equipment .......................................................................................12
    Schedule B-4: Unbundled Construction Work in Progress ...............................................................12
    Schedule B-5: Unbundled Accumulated Depreciation.......................................................................13
    Schedule B-6: Unbundled Plant Held for Future Use .......................................................................13
    Schedule B-7: Unbundled Accumulated Provision Balances .............................................................13
    Schedule B-8: Unbundled Materials and Supplies............................................................................13
    Schedule B-9: Unbundled Cash Working Capital..............................................................................13
    Schedule B-10: Unbundled Prepayments ..........................................................................................14
    Schedule B-11: Unbundled Other Rate Base Items ..........................................................................14
    Schedule B-12: Unbundled Regulatory Assets (See Attached Form).................................................14

**SCHEDULE C: RATE OF RETURN, DEBT SERVICE COVERAGE, CASH FLOW, OR
TIMES INTEREST EARNED RATIO**..........................................................................................**15**
    Schedule C-1: Rate of Return Method ..............................................................................................15
    Schedule C-2: Debt Service Coverage Method: ...............................................................................15
    Schedule C-3: Cash Flow Method ....................................................................................................16
    Schedule C-4: Times Interest Earned Method: .................................................................................17

**SCHEDULE D: OPERATION & MAINTENANCE EXPENSES** ...............................................**18**
    Schedule D-1: O&M Expenses..........................................................................................................18
    Schedule D-2: A&G Expenses ..........................................................................................................18
    Schedule D-3: Payroll Expense Distribution ....................................................................................19
    Schedule D-5: Summary of Exclusions from Reporting Period (See Attached Form).......................19

**SCHEDULE E: OTHER ITEMS** ................................................................................................**20**
    Schedule E-1: Depreciation Expense ................................................................................................20
    Schedule E-2: Taxes Other Than Federal Income Taxes ..................................................................20
    Schedule E-3: Federal Income ..........................................................................................................20
    Schedule E-4: Other Expenses..........................................................................................................20
    Schedule E-5: Other Revenue Items (credit) ....................................................................................21
    Schedule E-6: Wheeling Revenue under Existing Contracts..............................................................21

**SCHEDULE F: FUNCTIONALIZATION FACTORS** ...............................................................**22**

*SECTION II: FORECAST YEAR DATA* ....................................................................................*25*
    Schedule A(f): Summary of Transmission Cost of Service (See Attached Form)..............................25

**SCHEDULE B(f): RATE BASE**.................................................................................................**26**
    Schedule B(f): Summary of Transmission Rate Base (See Attached Form)........................................26
    Schedule B(f)-1: Original Cost of Transmission Plant.......................................................................26
    Schedule B(f)-2: General Plant Functionalized to Transmission........................................................26
    Schedule B(f)-3: Communication Equipment in Transmission ..........................................................26
    Schedule B(f)-4: Unbundled Construction Work in Progress in Transmission ...................................27
    Schedule B(f)-5: Unbundled Accumulated Depreciation in Transmission..........................................27
    Schedule B(f)-6: Unbundled Plant Held for Future Use in Transmission ...........................................27

017

Schedule B(f)-7: Unbundled Accumulated Provision Balances in Transmission ........................................... 27
Schedule B(f)-8: Materials and Supplies in Transmission ................................................................................. 27
Schedule B(f)-9: Cash Working Capital in Transmission .................................................................................. 28
Schedule B(f)-10: Prepayments in Transmission ............................................................................................... 28
Schedule B(f)-11: Other Rate Base Items in Transmission ............................................................................... 28
Schedule B(f)-12: Regulatory Assets (See Attached Form) ............................................................................. 28

**SCHEDULE C(f): RATE OF RETURN, DEBT SERVICE COVERAGE, CASH FLOW, OR
TIMES INTEREST EARNED RATIO ............................................................................................... 29**
Schedule C(f)-1: Rate of Return Method:: ......................................................................................................... 29
Schedule C(f)-2: Debt Service Coverage Method: ............................................................................................. 29
Schedule C(f)-3: Cash Flow Method: ................................................................................................................. 29
Schedule C(f)-4: Times Interest Earned Method: .............................................................................................. 29

**SCHEDULE D(f): OPERATION & MAINTENANCE EXPENSES ............................................... 30**
Schedule D(f)-1: Transmission O&M Expenses ................................................................................................ 30
Schedule D(f)-2: A&G Expenses in Transmission ............................................................................................. 30

**SCHEDULE E(f): OTHER ITEMS ................................................................................................... 31**
Schedule E(f)-1: Transmission Depreciation Expense ....................................................................................... 31
Schedule E(f)-2: Taxes Other Than Federal Income Taxes in Transmission .................................................... 31
Schedule E(f)-3: Federal Income Taxes ............................................................................................................. 31
Schedule E(f)-4: Other Expenses in Transmission ............................................................................................ 31
Schedule E(f)-5: Other Revenue Items (credit) in Transmission ...................................................................... 32

*SECTION III AFFILIATE DATA* ........................................................................................................ 33

**General Instructions** ........................................................................................................................... 33

**Guiding Principles** ............................................................................................................................. 33

**SCHEDULE N: AFFILIATE DATA** ................................................................................................ 34
Schedule N-1A: ................................................................................................................................................... 34
Schedule N-1B: ................................................................................................................................................... 34
Schedule N-2A: ................................................................................................................................................... 34
Schedule N-2B: ................................................................................................................................................... 34
Schedule N-3A: ................................................................................................................................................... 34
Schedule N-3B: ................................................................................................................................................... 34
Schedule N-4A: ................................................................................................................................................... 34
Schedule N-4B: ................................................................................................................................................... 35
Schedule N-5A: ................................................................................................................................................... 35
Schedule N-5B: ................................................................................................................................................... 35
Schedule N-6A: ................................................................................................................................................... 35
Schedule N-6B: ................................................................................................................................................... 35
Schedule N-7A: ................................................................................................................................................... 35
Schedule N-7B: ................................................................................................................................................... 35
Schedule N-8: ...................................................................................................................................................... 35
Schedule N-9A: ................................................................................................................................................... 36
Schedule N-9B: ................................................................................................................................................... 36
Schedule N-10A: ................................................................................................................................................. 36
Schedule N-10B: ................................................................................................................................................. 36
Schedule N-11: .................................................................................................................................................... 36
Schedule N-12: .................................................................................................................................................... 36

*SECTION IV FORMS* ......................................................................................................................... 37

**Schedule W: Confidentiality Schedule** ........................................................................................... 37

**Sample Forms (Schedules : A, B, B-12, D-5, A(f), B(f), B(f)-12)**.......................................................38

4

## SCHEDULE C: RATE OF RETURN, DEBT SERVICE COVERAGE, CASH FLOW, OR TIMES INTEREST EARNED RATIO

The determination of final revenue requirements for a municipal utility, river authority, power agency, or electric cooperative may be based on any of the following methods at the election of the filing TSP.

### Schedule C-1: Rate of Return Method

The rate of return may be the TSP's weighted average cost of capital based upon the TSP's capitalization at the end of the Historic Year. A schedule showing the calculation shall be provided. The cost of debt capital and owner's equity shall be the weighted average cost as of the end of the Historic Year. A cost of owner's equity equal to the average yield for bonds of an entity with the TSP's credit rating published in Moody's Credit Perspective or similar publication during the most recent three months plus two percent shall be presumed reasonable. The TSP shall justify the use of any other rate of return, and shall specify the special circumstances that warrant the use of a different rate of return. Supporting documentation shall be provided for the average bond yields used in the cost of equity calculation.

### Description Of Schedules:
A schedule showing the calculation of the TSP's weighted average cost of capital shall be provided

### Schedule C-2: Debt Service Coverage (DSC) Method:

A return based on the TSP's debt service expenses as of the end of the Historic Year, and the debt service coverage levels stated in the TSP's most recently issued bond and debt covenants plus additional coverage of 0.25 for municipal utilities and river authorities shall be presumed reasonable. To the extent the utility can show that short-term debt has been utilized in a cost-effective manner as a reasonable alternative to long-term financing, its principal and interest and an additional coverage of 0.25 may be included in calculating the return. The return for short-term debt shall not include the coverage that is specified in the bond and debt covenants unless the covenants include short-term debt service in the denominator of the DSC ratio that is used to calculate default on the debt. To the extent there are no minimum debt service coverage requirements in the TSP's bond resolutions, the Board of Director's policy, with respect to coverage, shall be considered. At the option of the TSP, the return or debt service coverage approved by a municipality's or a river authority's ratemaking authority, within three years of the TCOS, filing may be used. The TSP shall justify the use of any other debt service coverage, and shall specify the reasonable circumstances that support the use of different debt service coverage.

The Texas Municipal Power Agency or its successor in interest may, at its option, use the rate of return method for calculating its transmission cost of service. If the rate of return method is used, the return component for the transmission cost of service revenue requirement shall be sufficient to meet the transmission function's pro rata share of levelized debt service and debt service coverage ratio (1.50) and other annual debt obligations; provided, however, that the total levelized debt service may not exceed the total debt service under the current payment schedule.

15

Any additional revenue generated by the methodology described in this subsection shall be applied to reduce the agency's outstanding indebtedness.

An electric cooperative may, at its option, use the debt service coverage method for calculating its transmission cost of service. The debt service coverage levels stated in the cooperative's most recent debt covenants plus additional coverage of 0.50 shall be presumed reasonable. To the extent that short-term debt is included in the calculation of these debt service coverage level covenants, it may be included in the debt service coverage used to calculate the transmission cost of service. To the extent there are no minimum debt service coverage requirements in the cooperative's debt covenants, the Board of Director's policy, with respect to coverage, shall be considered. At the option of the TSP, debt service coverage, based on rates approved by a cooperative's ratemaking authority, within three years of the TCOS filing may be used. The cooperative shall justify the use of any other debt service coverage, and shall specify the reasonable circumstances that support the use of different debt service coverage.

Description of Schedules:
a. For utilities using the debt service coverage method, a schedule showing the debt service requirement for each debt issue outstanding at the end of the fiscal year shall be provided, as well as relevant excerpts of the bond and debt covenants supporting the debt service coverage utilized.
b. An additional schedule showing the calculation of return and rate of return on invested capital in total plant (rate base) shall be provided. Return is computed based on the amount of debt service requirements (net of capitalized interest) times the coverage ratio described above, less interest income and depreciation. Supporting fiscal or calendar year-end audited financial statements (if available) and any other documents necessary to support the TSP's debt service requirement and other components in the return calculation, including the sources of interest income, shall be provided. In addition, the following financial ratios shall be provided, based on the requested debt service coverage ratio: *revenues per kWh; and net income per revenue dollar.* The percentage of revenues from generation and the percentage of revenues from distribution should be provided if unbundled, and if not unbundled, then generation and distribution revenues should be provided on a bundled basis. If the TSP has any unique characteristics, which might have a bearing on return, it should provide a narrative describing the characteristics.

Schedule C-3: Cash Flow Method

A TSP may elect to use the cash flow method for determining its transmission revenue requirement based on the Historic Year. If the TSP elects to use the cash flow method, the Commission shall consider reasonable cash needs in to the following categories:
A debt service (including principal and interest) for long- term and short-term debt;
B funding of reserve requirements on both long-term and short-term debt as set forth in revenue bond and debt ordinances;
C for municipal utilities, annual payments for transfers to the city's general fund at rates established by the municipal utility's governing authority, to the extent such amounts are not recovered through other elements of the TCOS.
D capital lease payments and/or finance lease payments;

16

# APPENDIX C

## Sec. 551.042. Inquiry Made at Meeting.

**(a)** If, at a meeting of a governmental body, a member of the public or of the governmental body inquires about a subject for which notice has not been given as required by this subchapter, the notice provisions of this subchapter do not apply to:

**(1)** a statement of specific factual information given in response to the inquiry; or

**(2)** a recitation of existing policy in response to the inquiry.

**(b)** Any deliberation of or decision about the subject of the inquiry shall be limited to a proposal to place the subject on the agenda for a subsequent meeting.

## History

Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

---

**End of Document**

# APPENDIX D

## Sec. 2001.144. Decisions or Orders; When Final.

**(a)** A decision or order in a contested case is final:

**(1)** if a motion for rehearing is not filed on time, on the expiration of the period for filing a motion for rehearing;

**(2)** if a motion for rehearing is timely filed, on the date:

**(A)** the order overruling the latest filed motion for rehearing is signed; or

**(B)** the latest filed motion for rehearing is overruled by operation of law;

**(3)** if a state agency finds that an imminent peril to the public health, safety, or welfare requires immediate effect of a decision or order, on the date the decision or order is signed, provided that the agency incorporates in the decision or order a factual and legal basis establishing an imminent peril to the public health, safety, or welfare; or

**(4)** on:

**(A)** the date specified in the decision or order for a case in which all parties agree to the specified date in writing or on the record; or

**(B)** if the agreed specified date is before the date the decision or order is signed, the date the decision or order is signed.

**(b)** If a decision or order is final under Subsection (a)(3), a state agency must recite in the decision or order the finding made under Subsection (a)(3) and the fact that the decision or order is final and effective on the date signed.

## History

Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993; am. Acts 1997, 75th Leg., ch. 611 (S.B. 637), § 1, effective September 1, 1997; Acts 2015, 84th Leg., ch. 625 (S.B. 1267), § 7, effective September 1, 2015; Acts 2017, 85th Leg., ch. 430 (S.B. 1446), § 4, effective September 1, 2017.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

# APPENDIX E

## Sec. 2001.146. Motions for Rehearing: Procedures.

**(a)** A motion for rehearing in a contested case must be filed by a party not later than the 25th day after the date the decision or order that is the subject of the motion is signed, unless the time for filing the motion for rehearing has been extended under Section 2001.142, by an agreement under Section 2001.147, or by a written state agency order issued under Subsection (e). On filing the motion for rehearing, the movant shall send copies of the motion to all other parties using the notification methods specified by Section 2001.142(a).

**(b)** A party must file with the state agency a reply, if any, to a motion for rehearing not later than the 40th day after the date the decision or order that is the subject of the motion is signed, or not later than the 10th day after the date a motion for rehearing is filed if the time for filing the motion for rehearing has been extended under Section 2001.142, by an agreement under Section 2001.147, or by a written state agency order under Subsection (e). The party filing the reply shall send copies of the reply to all other parties using the notification methods specified by Section 2001.142(a).

**(c)** A state agency shall act on a motion for rehearing not later than the 55th day after the date the decision or order that is the subject of the motion is signed or the motion for rehearing is overruled by operation of law.

**(d)** If a state agency board includes a member who does not receive a salary for work as a board member and who resides outside Travis County, the board may rule on a motion for rehearing at a meeting or by:

    **(1)** mail;

    **(2)** telephone;

    **(3)** telegraph; or

    **(4)** another suitable means of communication.

**(e)** A state agency or a person authorized to act for the agency may, on its own initiative or on the motion of any party for cause shown, by written order extend the time for filing a motion or reply or taking agency action under this section, provided that the agency or person extends the time or takes the action not later than the 10th day after the date the period for filing a motion or reply or taking agency action expires. An extension may not extend the period for agency action beyond the 100th day after the date the decision or order that is the subject of the motion is signed.

**(f)** In the event of an extension, a motion for rehearing is overruled by operation of law on the date fixed by the order or, in the absence of a fixed date, the 100th day after the date the decision or order that is the subject of the motion is signed.

**(g)** A motion for rehearing must identify with particularity findings of fact or conclusions of law that are the subject of the complaint and any evidentiary or legal ruling claimed to be erroneous. The motion must also state the legal and factual basis for the claimed error.

**(h)** A subsequent motion for rehearing is not required after a state agency rules on a motion for rehearing unless the order disposing of the original motion for rehearing:

**(1)** modifies, corrects, or reforms in any respect the decision or order that is the subject of the complaint, other than a typographical, grammatical, or other clerical change identified as such by the agency in the order, including any modification, correction, or reformation that does not change the outcome of the contested case; or

**(2)** vacates the decision or order that is the subject of the motion and provides for a new decision or order.

**(i)** The time limits and other requirements for filing a subsequent motion for rehearing, a reply to the subsequent motion for rehearing, and a ruling on the subsequent motion for rehearing are governed by this section and Sections 2001.142, 2001.144, 2001.145, and 2001.147.

## History

Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993; Acts 2015, 84th Leg., ch. 625 (S.B. 1267), § 9, effective September 1, 2015; Acts 2017, 85th Leg., ch. 430 (S.B. 1446), § 5, effective September 1, 2017.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX F

## Sec. 2001.171. Judicial Review.

A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter.

## History

Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX G

## Sec. 2001.174. Review Under Substantial Evidence Rule or Undefined Scope of Review.

If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but:

**(1)** may affirm the agency decision in whole or in part; and

**(2)** shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:

**(A)** in violation of a constitutional or statutory provision;

**(B)** in excess of the agency's statutory authority;

**(C)** made through unlawful procedure;

**(D)** affected by other error of law;

**(E)** not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or

**(F)** arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

## History

Enacted by Acts 1993, 73rd Leg., ch. 268 (S.B. 248), § 1, effective September 1, 1993.

Texas Statutes & Codes Annotated by LexisNexis®
Copyright © 2025 All rights reserved.

**End of Document**

# APPENDIX H

## § 22.80. Commission Prescribed Forms

The commission may require that certain reports and applications be submitted on standard forms. The commission filing clerk shall maintain a complete index to and set of all commission forms. All documents that are the subject of an official form shall contain all matters designated in the official form and shall conform substantially to the official form. Prior to the implementation of any new form or significant change to an existing form, the change or new form shall be referenced in the "In Addition" section of the Texas Register for public comment. For good cause, new forms or significant changes to existing forms may be implemented without publication on an interim basis for a period not to exceed 180 days.

## History

**SOURCE:**

The provisions of this § 22.80 adopted to be effective November 1, 1993, 18 TexReg 6641; amended to be effective September 8, 1995, 20 TexReg 6627; amended to be effective September 23, 1999, 24 TexReg 7401

**End of Document**

# APPENDIX I

## § 25.192. Transmission Rates for Export from ERCOT

**(a)** Tariffs. Each transmission service provider (TSP) shall file a tariff for transmission service to establish its rates and other terms and conditions and shall apply its tariffs and rates on a non-discriminatory basis. The tariff shall apply to all distribution service providers (DSPs) and any entity scheduling the export of power from the Electric Reliability Council of Texas (ERCOT) region. The tariff shall not apply to any entity engaging in wholesale storage as described by § 25.501(m) of this title (relating to Wholesale Market Design for the Electric Reliability Council of Texas) (storage entity).

**(b)** Charges for transmission service delivered within ERCOT. DSPs, excluding storage entities, shall incur transmission service charges pursuant to the tariffs of the TSP.

**(1)** A TSP's transmission rate shall be calculated as its commission-approved transmission cost of service divided by the average of ERCOT coincident peak demand for the months of June, July, August and September (4CP), excluding the portion of coincident peak demand attributable to wholesale storage load. A TSP's transmission rate shall remain in effect until the commission approves a new rate. The TSP's annual rate shall be converted to a monthly rate. The monthly transmission service charge to be paid by each DSP is the product of each TSP's monthly rate as specified in its tariff and the DSP's previous year's average of the 4CP demand that is coincident with the ERCOT 4CP.

**(2)** Payments for transmission services shall be consistent with commission orders, approved tariffs, and § 25.202 of this title (relating to Commercial Terms for Transmission Service).

**(c)** Transmission cost of service. The transmission cost of service for each TSP shall be based on the expenses in Federal Energy Regulatory Commission (FERC) expense accounts 560-573 (or accounts with similar contents or amounts functionalized to the transmission function) plus the depreciation, federal income tax, and other associated taxes, and the commission-allowed rate of return based on FERC plant accounts 350-359 (or accounts with similar contents or amounts functionalized to the transmission function), less accumulated depreciation and accumulated deferred federal income taxes, as applicable.

**(1)** The following facilities are deemed to be transmission facilities:

**(A)** power lines, substations, reactive devices, and associated facilities, operated at 60 kilovolts or above, including radial lines operated at or above 60 kilovolts, except the step-up transformers and a protective device associated with the interconnection from a generating station to the transmission network;

**(B)** substation facilities on the high side of the transformer, in a substation where power is transformed from a voltage higher than 60 kilovolts to a voltage lower than 60 kilovolts;

**(C)** the portion of the direct-current interconnections with areas outside of the ERCOT region (DC ties) that are owned by a TSP in the ERCOT region, including those portions of the DC tie that operate at a voltage lower than 60 kilovolts; and

**(D)** capacitors and other reactive devices that are operated at a voltage below 60 kilovolts, if they are located in a distribution substation, the load at the substation has a power factor in excess of 0.95 as measured or calculated at the distribution voltage level without the reactive devices, and the reactive devices are controlled by an operator or automatically switched in response to transmission voltage.

**(E)** As used in subparagraphs (A) - (D) of this paragraph, reactive devices do not include generating facilities.

**(2)** For municipally owned utilities, river authorities, and electric cooperatives, the commission may permit the use of the cash flow method or other reasonable alternative methods of determining the annual transmission revenue requirement, including the return element of the revenue requirement, consistent with the rate actions of the rate-setting authority for a municipally owned utility.

**(3)** For municipally owned utilities, river authorities, and electric cooperatives, the return may be determined based on the TSP's actual debt service and a reasonable coverage ratio. In determining a reasonable coverage ratio, the commission will consider the coverage ratios required in the TSP's bond indentures or ordinances and the most recent rate action of the rate setting authority for the TSP.

**(4)** A municipally owned utility that is required to apply for a certificate of public convenience and necessity to construct, install, or extend a transmission facility within ERCOT pursuant to § 25.101 of this title (relating to Certification Criteria) is entitled to recover, through the utility's wholesale transmission rate, reasonable payments made to a taxing entity in lieu of ad valorem taxes on that transmission facility, provided that:

**(A)** The utility enters into a written agreement with the governing body of the taxing entity related to the payments;

**(B)** The amount paid is the same as the amount the utility would have to pay to the taxing entity on that transmission facility if the facility were subject to ad valorem taxation;

**(C)** The governing body of the taxing entity is not the governing body of the utility; and

**(D)** The utility provides the commission with a copy of the written agreement and any other information that the commission considers necessary in relation to the agreement.

**(5)** The commission may adopt rate-filing requirements that provide additional details concerning the costs that may be included in the transmission costs and how such costs should be reported in a proceeding to establish transmission rates.

**(d)** Billing units. No later than December 1 of each year, ERCOT shall determine and file with the commission the current year's average 4CP demand for each DSP, or the DSP's agent for transmission service billing purposes, as appropriate, excluding the portion of coincident peak demand attributable to wholesale storage load. This demand shall be used to bill transmission service for the next year. The ERCOT average 4CP demand shall be the sum of the coincident peak of all of the ERCOT DSPs, excluding the portion of coincident peak demand attributable to wholesale storage load, for the four intervals coincident with ERCOT system peak for the months of June, July, August, and September, divided by four. As used in this section, a DSP's average 4CP demand is determined from the total demand, coincident with the ERCOT 4CP, of all customers connected to a DSP, including load served at transmission voltage, but excluding the load of wholesale storage entities. The measurement of the coincident peak shall be in accordance with commission-approved ERCOT protocols.

**(e)** Transmission rates for exports from ERCOT. A transmission service charge for exports of power from ERCOT must be assessed to transmission service customers for transmission service within the boundaries of the ERCOT region, in accordance with this section and the ERCOT protocols.

    **(1)** A transmission service customer must be assessed a transmission service charge for the use of the ERCOT transmission system in exporting power from ERCOT based on scheduled exports and the rates established under subsections (c) and (d) of this section. The intervals must consist of one hour.

    **(2)** The hourly transmission rate for exports from ERCOT will be the TSP's annual rate established under subsections (c) and (d) of this section divided by 8760.

    **(3)** The entity scheduling the export of power over a DC tie is solely responsible to the TSP for payment of transmission service charges under this subsection.

    **(4)** Beginning with the January 2023 reporting month, ERCOT must file a public report with the commission stating the total amount of energy imported and the total amount of energy exported over each DC tie for the calendar month. The report must also include the total amount of energy exported from the ERCOT region during the reporting month and each of the preceding 11 calendar months, reported by scheduling entity. Each report must be filed within 45 days of the end of the reporting month.

**(f)** Transmission revenue. Revenue from the transmission of electric energy out of the ERCOT region over the DC ties that is recovered under subsection (e) of this section shall be credited to all transmission service customers as a reduction in the transmission cost of service for TSPs that receive the revenue.

**(g)** Revision of transmission rates. Each TSP in the ERCOT region shall periodically revise its transmission service rates to reflect changes in the cost of providing such services. Any request for a change in transmission rates shall comply with the filing requirements established by the commission under this section.

**(h)** Interim Update of Transmission rates.

**(1)** Frequency. Each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than once per calendar year to reflect changes in its invested capital. Upon the effective date of an amendment to § 25.193 pursuant to an order in Project Number 37909, Rulemaking Proceeding to Amend P.U.C. Subst. R. 25.193, Relating to Distribution Service Provider Transmission Cost Recovery factors (TCRF), that allows a distribution service provider to recover, through its transmission cost recovery factor, all transmission costs charged to the distribution service provider by TSPs, each TSP in the ERCOT region may apply to update its transmission rates on an interim basis not more than twice per calendar year to reflect changes in its invested capital. If the TSP elects to update its transmission rates, the new rates shall reflect the addition and retirement of transmission facilities and include appropriate depreciation, federal income tax and other associated taxes, and the commission authorized rate of return on such facilities as well as changes in loads. If the TSP does not have a commission-authorized rate of return, an appropriate rate of return shall be used.

**(2)** Reconciliation. An update of transmission rates under paragraph (1) of this subsection shall be subject to reconciliation at the next complete review of the TSP's transmission cost of service, at which time the commission shall review the costs of the interim transmission plant additions to determine if they were reasonable and necessary. Any amounts resulting from an update that are found to have been unreasonable or unnecessary, plus the corresponding return and taxes, shall be refunded with carrying costs determined as follows: for the time period beginning with the date on which over-recovery is determined to have begun to the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the same rate of return that was applied to the transmission investments included in the update. For the time period beginning with the effective date of the TSP's rates set in that complete review of the TSP's transmission cost of service, carrying costs shall be calculated using the TSP's rate of return authorized in that complete review.

**(3)** Future consideration of effect on TSP's financial risk and rate of return. For a TSP that has increased its rates pursuant to paragraph (1) of this subsection, the commission may, in setting rates in the next complete review of the TSP's transmission cost of service, expressly consider the effects of reduced regulatory lag resulting from the interim updates to the TSP's rates and the concomitant impact on the TSP's financial risk and rate of return.

**(4)** Commission processing of application. The commission shall process an application filed pursuant to paragraph (1) of this subsection in the following manner.

> **(A)** Notice and intervention deadline. The applicant shall provide notice of its application to all parties in the applicant's last complete review of the applicant's transmission cost of service and all of the distribution service providers listed in the last docket in which the commission set the annual transmission service charges for the Electric Reliability Council of Texas. The intervention deadline shall be 21 days from the date service of notice is completed.

**(B)** Sufficiency of application. A motion to find an application materially deficient shall be filed no later than 21 days after an application is filed. The motion shall be served on the applicant by hand delivery, facsimile transmission, or overnight courier delivery, or by e-mail if agreed to by the applicant or ordered by the presiding officer. The motion shall specify the nature of the deficiency and the relevant portions of the application, and cite the particular requirement with which the application is alleged not to comply. The applicant's response to a motion to find an application materially deficient shall be filed no later than five working days after such motion is received. If within ten working days after the deadline for filing a motion to find an application materially deficient, the presiding officer has not filed a written order concluding that material deficiencies exist in the application, the application is deemed sufficient.

**(C)** Review of application. A proceeding initiated pursuant to paragraph (1) of this subsection is eligible for disposition pursuant to § 22.35(b)(1) of this title (relating to Informal Disposition). If the requirements of § 22.35 of this title are met, the presiding officer shall issue a notice of approval within 60 days of the date a materially sufficient application is filed unless good cause exists to extend this deadline or the presiding officer determines that the proceeding should be considered by the commission.

**(5)** Filing Schedule. The commission may prescribe a schedule for providers of transmission services to file proceedings to revise the rates for such services.

**(6)** DSP's right to pass through changes in wholesale rates. A DSP may expeditiously pass through to its customers changes in wholesale transmission rates approved by the commission, pursuant to § 25.193 of this title (relating to Distribution Service Provider Transmission Cost Recovery Factors (TCRF)).

**(7)** Reporting requirements. TSPs shall file reports that will permit the commission to monitor their transmission costs and revenues, in accordance with any filing requirements and schedules prescribed by the commission.

## History

### SOURCE:

The provisions of this § 25.192 adopted to be effective April 13, 1999, 24 TexReg 2874; amended to be effective September 30, 1999, 24 TexReg 8162; amended to be effective December 29, 1999, 24 TexReg 11722; amended to be effective June 20, 2001, 26 TexReg 4440; amended to be effective August 25, 2010, 35 TexReg 7195; amended to be effective April 18, 2012, 37 TexReg 2613; amended to be effective July 5, 2016, 41 TexReg 4805; amended to be effective December 20, 2022, 47 TexReg8267

# Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Melissa Ethridge on behalf of Jose de la Fuente
Bar No. 00793605
methridge@lglawfirm.com
Envelope ID: 103098922
Filing Code Description: Brief Requesting Oral Argument
Filing Description: Brief for Appellee
Status as of 7/14/2025 2:24 PM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Katherine Coleman | 24059596 | kcoleman@omm.com | 7/14/2025 2:17:01 PM | SENT |
| Jamie Mauldin | 24065694 | jmauldin@lglawfirm.com | 7/14/2025 2:17:01 PM | SENT |
| Gabrielle Smith | 24093172 | gsmith@lglawfirm.com | 7/14/2025 2:17:01 PM | SENT |
| David Laurent | | david.laurent@oag.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| John RHulme | | John.Hulme@oag.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| Jose E.de la Fuente | | jdelafuente@lglawfirm.com | 7/14/2025 2:17:01 PM | SENT |
| Amy Hoffee | | amy.hoffee@cityofdenton.com | 7/14/2025 2:17:01 PM | SENT |
| Chris Ekoh | | chris.ekoh@opuc.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| Justin Swearingen | | justin.swearingen@opuc.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| Jordan Pratt | | Jordan.Pratt@oag.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| Colton Halter | | colton.halter@oag.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| John Hubbard | | jhubbard@omm.com | 7/14/2025 2:17:01 PM | SENT |
| Christiana Segura | 24143396 | christiana.segura@opuc.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| Roslyn Warner | | rwarner@lglawfirm.com | 7/14/2025 2:17:01 PM | SENT |
| Devin Alexander | | devin.alexander@cityofdenton.com | 7/14/2025 2:17:01 PM | SENT |
| Michael McMillin | | mmcmillin@omm.com | 7/14/2025 2:17:01 PM | SENT |
| Sharbel Sfeir | | sharbel.sfeir@opuc.texas.gov | 7/14/2025 2:17:01 PM | SENT |
| Marcella Lunn | | marcella.lunn@cityofdenton.com | 7/14/2025 2:17:01 PM | SENT |